OPINION
{¶ 1} Defendant-appellant, Shawn Lamar Sowell, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of murder, with a firearm specification, following a jury trial. For the reasons that follow, we affirm the trial court's judgment.
 {¶ 2} Appellant was indicted on one count of aggravated murder, in violation of R.C. 2903.01, with a firearm specification. Appellant pled not guilty and the case was tried to a jury. Appellee presented the following evidence. *Page 2 
 {¶ 3} Ahman Fares testified on behalf of appellee as follows. Fares worked as a cashier at Kelly's Carryout located at 1521 North 4th Street ("4th") at the corner of 11th Avenue ("11th") in Columbus, Ohio. On the evening of April 18, 2005, he was standing outside the front door of the carryout talking to Jimon Jones. An SUV pulled up directly across the street from the carryout and stopped. Neither Fares nor Jones recognized the SUV; they noticed it only because it had distinctive wheel rims.
 {¶ 4} A man who had been standing on the sidewalk across the street from the carryout approached the passenger side of the SUV and conversed with the occupants for approximately 30 seconds. The SUV then pulled away and turned right onto 11th; the man crossed the street and walked toward the carryout. According to Fares, Jones did not appear to recognize the man, and said nothing about him as the man approached the carryout. Thereafter, Fares, presuming the man to be a potential customer, entered the carryout and stood behind the counter, which Fares estimated to be "maybe 15 feet at the most" from the front door. (Tr. 420.)
 {¶ 5} The man, whom Fares had never seen before, then entered the carryout, approached the counter, purchased a cigar, and walked toward the door. At the same time, Jones entered the carryout. According to Fares, Jones again did not appear to recognize the man, and the two did not communicate in any way as they passed one another. As Fares turned away from the door, he heard several gunshots. He ducked behind the counter and heard two more gunshots. Thereafter, he looked up and saw Jones lying on the floor. Although Fares did not actually see who fired the shots, he saw "someone" with a gun, and was "pretty sure" it was the man who purchased the cigar, *Page 3 
because "nobody else came into the store" and "it happened too fast for it to be anybody else." (Tr. 422.) He then observed the man run down a nearby alley.
 {¶ 6} Fares immediately called 911; police and emergency medical personnel arrived shortly thereafter. Fares told the police that the man who purchased the cigar was a dark-skinned African-American, 5' 11" to 6', with a full beard, wearing dark pants and a green shirt with a yellow picture on the front of it. At trial, Fares described the man's beard as "full," i.e., "covering his entire face * * * not like a goatee." (Tr. 427.) Two days after the shooting, the police showed Fares two separate photo arrays, both of which included a photograph of appellant, and asked him if he could identify the person who shot Jones. Fares could not identify the shooter from either of the arrays.
 {¶ 7} At trial, Fares admitted that the man who purchased the cigar stood close to him during the transaction; indeed, he testified he was "face-to-face" with the man. (Tr. 427.) However, he did not pay particularly close attention to the man because he was just "another customer" (Tr. 425); in addition, he had to turn away from the man in order to retrieve the cigar from under the counter. When presented with the photo arrays at trial, he could not identify the man who purchased the cigar from him. Indeed, he testified that the man in the carryout did not resemble any of the photographs in either of the arrays. Fares testified that he probably would not be able to recognize the man if he saw him again because the incident happened so quickly and the man had a full beard which covered most of his face.
 {¶ 8} On cross-examination, Fares admitted that he paid at least "some attention" to the man as he processed the cigar purchase; as such, he "had him in [his] view for at *Page 4 
least a reasonable period of time." (Tr. 447.) He described the man's beard as "very obvious," i.e., two to three inches long around his entire face. (Tr. 455)
 {¶ 9} Columbus Police Officer John Haley testified on behalf of appellee as follows. Officer Haley arrived at the carryout shortly after receiving a radio dispatch about the shooting. Upon arrival, he observed a group of individuals standing across the street from the carryout. He then interviewed Fares, who provided a description of a man who had been in the store immediately prior to the shooting.
 {¶ 10} On cross-examination, Officer Haley testified that he arrived at the carryout "within a minute" after receiving the radio dispatch. (Tr. 479.) In addition to the group of people he observed standing across the street from the carryout, he also observed a group of individuals running in that general direction; he did not, however, interview any of those persons. On redirect, Officer Haley testified that it is not unusual to encounter a large group of people at the scene of a shooting.
 {¶ 11} Crime Scene Search Unit ("CSSU") Detective Phillip Walden testified on behalf of appellee as follows. CSSU collected, among other items, seven spent shell casings just inside the door of the carryout. CSSU did not collect DNA evidence from the counter or any articles on or near the counter, as the information provided about the shooting indicated that no physical confrontation other than the shooting of the victim had transpired; hence, there would likely be no DNA evidence at the scene other than the victim's blood. Detective Walden also testified that CSSU did not recover any fingerprints of value from either the counter or the SUV.
 {¶ 12} On cross-examination, Detective Walden admitted that DNA evidence, if present, can be obtained from "almost any surface." (Tr. 545.) He further testified that *Page 5 
CSSU did not dust the door or doorframe for fingerprints because the information provided about the shooting indicated that the door remained open throughout the entire incident.
 {¶ 13} The driver of the SUV, Anthony Crump, testified on behalf of appellee as follows. On the evening of April 18, 2005, he and his cousin, Andre Brown, were riding around smoking marijuana. Enroute to purchase more marijuana from a friend on 11th, Crump drove northbound on 4th, stopping twice along the way. Crump first stopped near Ninth Avenue; he then continued northbound on 4th and stopped in front of an apartment building at 1504 North 4th, "a little before" 11th. (Tr. 592, 594.) He spoke to some people at each of the stops, including a man named "Shawn" (Tr. 595), whom he had known "slightly" from "out in the neighborhood" for approximately ten years. (Tr. 583.) At first, Crump was "not all the way sure" at which of the two stops he spoke to Shawn. (Tr. 595.) However, after reviewing a videotape of his interview with police the night of the shooting, he testified that he stopped and "talked to a few people" including Shawn while driving on 4th (Tr. 600) and that he spoke to Shawn near a house "right across from the market." (Tr. 601.) He identified appellant as the "Shawn" with whom he conversed during the second stop.
 {¶ 14} Crump further testified that following the conversation with appellant, he drove northbound on 4th and turned right onto 11th; he had "no idea" what happened to appellant after he drove away. (Tr. 602.) Crump continued on 11th for two blocks; he stopped on the side of the street to purchase more marijuana. As he exited his vehicle, he heard shots fired "in the neighborhood." (Tr. 605.) He completed the marijuana purchase, returned to the SUV, drove Brown home, and then went to a bar. Sometime *Page 6 
after he left the bar, the police stopped him; they later questioned him and seized his SUV.
 {¶ 15} On cross-examination, Crump testified that he was "high" the night of April 18, 2005 because he had smoked several marijuana "blunts," some of which were laced with cocaine. (Tr. 625-626, 628, 630, 635, 662.) During his testimony, he suddenly recalled that a man named "Little C" was also in the SUV with him and Brown. Crump assumed "Little C" was "young," somewhere "between 18 and 22," because he "[did] not have a mustache like [Crump's]." (Tr. 628.) He admitted that he had never mentioned "Little C" to the police.
 {¶ 16} Crump further testified that he stopped somewhat south of the carryout, not directly across from it, and that there were several people outside when he stopped, including appellant. He also averred he told the police that appellant approached the SUV from the middle of the street because he was scared after police told him they believed he and Brown were involved in the murder. He admitted, however, that he could not recall if appellant was in the street or on the sidewalk.
 {¶ 17} Crump also testified that police told him during the interview that he and Brown were both implicated in the crime, i.e., that even if they did not do it, they had either provided the shooter with the gun or gave him the "A[-]ok" to shoot Jones (Tr. 645); accordingly, he was scared and thus tried "to satisfy" the police by telling them anything he thought they wanted to hear. (Tr. 646, 659.) He also testified that he was "high" that night and was "not one hundred percent sure" about anything he told the police. (Tr. 643-644.) *Page 7 
 {¶ 18} Crump further averred he did not describe appellant to the police; rather, he essentially adopted the description police provided to him, i.e., a male black with a beard, dressed in a dark shirt with a yellow image on the front of it. However, at trial, he could not recall if appellant had a beard on the night of the shooting. He further testified that appellant did not have a gun, that he had never seen appellant with a "real" or "full" beard (Tr. 648), and that he did not witness the shooting.
 {¶ 19} On redirect, the prosecution showed Crump a slightly larger version of the photograph that was included in the first photo array shown to Fares ("State's Exhibit 1") on April 20, 2005. Crump identified the photograph as one of appellant and noted that appellant had what "look[ed] like a beard that was "not that long." (Tr. 678.) Crump admitted he had never seen appellant wear such a beard.
 {¶ 20} Lead homicide Detective James Porter testified on behalf of the state as follows. Detective Porter corroborated Detective Walden's testimony regarding the processing of the crime scene. He further testified that he interviewed Crump, whom he described as "evasive," but not "high" during the interview. (Tr. 708.) Based upon the information provided by Crump, Detective Porter assembled two separate photo arrays, each including a different picture of appellant. Detective Porter corroborated Fares' testimony that he was unable to positively identify appellant from either of the arrays as the man who shot Jones.
 {¶ 21} Approximately one month after the murder, Detective Porter interviewed Brown, who provided information which led Detective Porter to file a warrant for appellant's arrest. Appellant turned himself in to the police two days after the warrant was *Page 8 
issued. According to Detective Porter, appellant had a "light beard and mustache" at the time. (Tr. 717.)
 {¶ 22} On cross-examination, Detective Porter testified that he mentioned during the interview with Crump that he had certain information which suggested that the person who committed the murder resembled Brown. Detective Porter further testified that Crump did not mention "Little C" during the interview. Detective Porter identified "Defendant's Exhibit A" as a slate card photograph of appellant taken May 19, 2005, the day appellant turned himself in to the police.
 {¶ 23} On redirect, Detective Porter described Brown as approximately 5' 7" with a "thick build." (Tr. 734.) On recross, Detective Porter admitted that he never obtained a physical description of "Little C."
 {¶ 24} Joshua Zachrich, appellee's final witness, testified as follows. Zachrich is employed by a company that provides inmate telephone systems to prisons and jails, including the Franklin County Jail. The system permits inmates to make outgoing telephone calls, which are tracked via pin number to the particular inmate who initiated the call. At the start of each call, both the inmate and call recipient are informed that the call is being monitored and recorded.
 {¶ 25} Prior to trial, at the prosecutor's request, Zachrich retrieved two sets of telephone calls appellant made during his pre-trial incarceration in the Franklin County Jail. The first set encompassed calls placed between May 20, 2005 and May 30, 2005; the second set included calls made between July 13, 2005 and July 26, 2005. Zachrich provided a recording of the calls to the prosecutor on a compact disc ("CD"). Over appellant's objection, appellee played the CD ("State's Exhibit J-1a") for the jury. We will *Page 9 
set forth more detail about these telephone calls in our discussion of appellant's third assignment of error.
 {¶ 26} Following Zachrich's testimony, appellee rested. Appellant did not testify and did not call any witnesses. He submitted only "Defendant's Exhibit A," his May 19, 2005 slate card photograph, as evidence. The trial court then granted appellant's Crim. R. 29 motion to dismiss the allegation that appellant committed the offense with prior calculation and design. Accordingly, the trial court charged the jury on the offense of murder, in violation of R.C. 2903.02, with a firearm specification. The jury found appellant guilty of murder, with a firearm specification, and the trial court sentenced him accordingly.
 {¶ 27} Appellant filed a notice of appeal and raises the following four assignments of error:
 ASSIGNMENT OF ERROR NO. I:
 THE TRIAL COURT COMMITTED STRUCTURAL ERROR WHEN IT PERMITTED A PERSON TO BE THROWN [OUT] OF THE COURTROOM WITHOUT A HEARING OR EVIDENCE OF DISRUPTION AND WHEN IT BARRED A PERSON FROM THE COURTROOM AND COURTHOUSE FOR THE REMAINDER OF THE TRIAL. THESE ORDERS VIOLATED SHAWN SOWELL'S RIGHT TO A PUBLIC TRIAL AS GUARANTEED BY THE FIRST, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION AND ARTICLE I, §§ 2, 10 AND 16 OF THE OHIO CONSTITUTION.
 ASSIGNMENT OF ERROR NO. II:
 THE REPRESENTATION PROVIDED TO SHAWN SOWELL FELL FAR BELOW THE PREVAILING NORMS FOR COUNSEL IN A CRIMINAL CASE, WAS UNREASONABLE, AND AFFECTED THE OUTCOME IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND *Page 10 FOURTEENTH AMENDMENTS AS WELL AS ART. I, § [§] 2, 9, 10, AND 16 OF THE OHIO CONSTITUTION.
 ASSIGNMENT OF ERROR NO. III:
 THE ADMISSION OF PORTIONS OF JAIL CALLS HAD LITTLE IF ANY RELEVANCE, DID NOT INDICATE CONSCIOUSNESS OF GUILT AS ARGUED BY THE PROSECUTOR AND WERE MORE PREJUDICIAL THAN PROBATIVE, DENYING SOWELL HIS RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 2, 10, AND 16 OF THE OHIO CONSTITUTION.
 ASSIGNMENT OF ERROR NO. IV:
 SOWELL'S CONVICTION IS BASED ON EVIDENCE THAT IS INSUFFICIENT AS A MATTER OF LAW. IN ADDITION, THE CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 28} Appellant asserts in his first assignment of error that the trial court committed structural error when it approved a courtroom deputy's removal of a member of appellant's family from the courtroom, and then issued its own order barring that family member from the courtroom and the courthouse for the remainder of the trial. Appellant contends the trial court's order violated his right to a public trial as guaranteed by the First, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Sections 2, 10, and 16, Article I, Ohio Constitution. We disagree.
 {¶ 29} During a recess taken in Crump's testimony, the prosecutor, outside the presence of the jury, notified the trial court that a courtroom deputy had informed him that while Crump was testifying, a person believed to be a member of appellant's family made a threatening gesture toward Crump, i.e., he pointed toward Crump "with both fingers simulating like he had a weapon in his hand" (Tr. 598) and that the deputy had removed *Page 11 
that person from the courtroom. Immediately thereafter, the trial court averred that "[t]hat family member will not be permitted back into this courtroom for the balance of the trial or at any time relative to these proceedings of the trial." (Tr. 599.)
 {¶ 30} Defense counsel responded, "[o]bviously, [the prosecutor] and I, neither one of us were aware of any of this going on until just when we came back in, and I have not talked to [the deputy] myself, but I am cautioning my people — ." Id. The trial court cautioned that "[a]nybody making any kind of gestures or anything like that or anything construed in that way, that person will be removed from the courthouse, not only from the courtroom, but from the courthouse. So anybody who is in here and wants to do that, bear that in mind." Id. Following this admonition, trial resumed; no further expulsions occurred.
 {¶ 31} Appellant argues that the trial court erred in excluding his family member from the trial based solely upon the hearsay representation of the prosecutor. Appellant maintains that the court should have investigated the matter further, i.e., held a hearing and questioned both the deputy and the family member, in order to substantiate the prosecutor's claim. Appellant further asserts that the trial court should have determined whether the jury was aware of the incident and, if so, whether it affected its deliberations. Appellant further contends the trial court erred in failing to consider any alternatives to excluding the family member from the remainder of the trial. In addition, appellant asserts the trial court erred in failing to enter any factual findings on the record to support its decision. Appellant avers the trial court's error was structural, mandating reversal of his conviction without a demonstration of prejudice. *Page 12 
 {¶ 32} The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." Section 10, Article I, Ohio Constitution also guarantees an accused the right to a public trial. Historically, the right to a public trial has been recognized as a safeguard against possible infringements against the accused. State v. Grant, Cuyahoga App. No. 87556, 2007-Ohio-1460, at ¶ 12. "An open courtroom is necessary to preserve and support the fair administration of justice because it encourages witnesses to come forward and be heard by the public, discourages perjury by the witnesses, and ensures that the judge and prosecutor will carry out their duties properly." Id., citing State v.Lane (1979), 60 Ohio St.2d 112, 119, and Waller v. Georgia (1984),467 U.S. 39, 104 S.Ct. 2210. Further, a public trial permits the general public to observe that the accused is "`fairly dealt with and not unjustly condemned, and that the presence of the interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.'" Id., quoting Waller at 43. The public's right to attend criminal trials is also implicit within the guarantees of the First Amendment. State v. Morris, 157 Ohio App.3d 395,398, citing State ex rel. The Repository, Div. of Thompson Newspapers,Inc. v. Unger (1986), 28 Ohio St.3d 418, 420.
 {¶ 33} "The violation of the right to a public trial is considered structural error and not subject to harmless-error standard." State v.Drummond, 111 Ohio St.3d 14, 2006-Ohio-5084, at ¶ 50, citingWaller, supra, at 49-50, fn. 9. "A structural error is a `defect affecting the framework within which the trial proceeds, rather than simply an error in the *Page 13 
trial process itself.'" Id., citing Arizona v. Fulminante (1991),499 U.S. 279, 310, 111 S.Ct. 1246.
 {¶ 34} However, "`the right to a public trial is not absolute and an order barring spectators from observing a portion of an otherwise public trial does not necessarily introduce error of constitutional dimension.'" State v. Bragg, Franklin App. No. 05AP-100, 2006-Ohio-1903, ¶ 24, quoting State v. Whitaker, Cuyahoga App. No. 83824,2004-Ohio-5016, ¶ 11. A trial court has the authority to exercise control over the proceedings and may exclude those courtroom spectators whose conduct is likely to interfere with the administration of justice or to denigrate the protection of public health, safety, and morals.Grant, at ¶ 13, citing Drummond. "A trial court's decision to remove spectators from a courtroom is reviewed under an abuse of discretion standard." Bragg, supra, citing State v. Brown (Nov. 25, 1998), Cuyahoga App. No. 73060.
 {¶ 35} In Waller, supra, the seminal case regarding the public trial guarantee, the trial court, over the defendant's objection, closed a suppression hearing to all persons other than witnesses, court personnel, the parties, and counsel. The Supreme Court of the United States set forth the following four-prong test to determine the need for a courtroom closure: first, the party seeking to close the trial or some portion of it must advance an overriding interest that is likely to be prejudiced; second, the closure must be no broader than necessary to protect that interest; third, the trial court must consider reasonable alternatives to closing the courtroom; and fourth, the court must make findings adequate to support the closure. Id. at 48.
 {¶ 36} Initially, we must first consider appellee's contention that appellant waived his right to a public trial by failing to object to the trial court's removal order. There is *Page 14 
some authority for appellee's position. See Drummond, supra, at ¶ 59 ("counsel's failure to object to the closing of the courtroom constitutes a waiver of the right to a public trial * * *"). See, also,Whitaker, supra, at ¶ 13, citing Peretz v. United States (1991),501 U.S. 923, 111 S.Ct. 2661 ("Failure to object to closing of the courtroom constitutes a waiver of the right to a public trial."). However, the Supreme Court of Ohio has more recently held that the right to a public trial cannot be waived by silence. See State v. Bethel,110 Ohio St.3d 416, 2006-Ohio-4853, at ¶ 81 ("Although Bethel did not object to the closing of the hearing, the right to a public trial under Section 10, Article I of the Ohio Constitution cannot be waived by the defendant's silence."). Therefore, appellant did not waive his right to a public trial by his failure to object. Id. Accordingly, we turn to the merits of appellant's argument.
 {¶ 37} Citing Shepard v. Artuz (S.D.N.Y. 2000), 99 Civ. 1912 (DC) andUnited States v. Perry (C.A.D.C., 2007), 479 F.3d 885, appellee urges that Waller does not apply to partial courtroom closures and, as such, the trial court was not required to engage in the Waller
four-part closed-courtroom analysis. We agree.
 {¶ 38} In Shepard, a court officer reported to the trial court during the defendant's state court trial that he observed a woman whom he believed to be the defendant's mother making "threatening gestures," i.e., making fists and slashing motions across her throat, toward a witness during her testimony. The trial court did not ask the witness if she observed the gestures; rather, the court instructed court officers to bring the woman into the courtroom for questioning. The woman acknowledged she was "related" to the defendant but denied that she made the gestures. The trial court overruled an immediate *Page 15 
defense motion for a mistrial, noting that two potential prosecution witnesses had been murdered prior to the trial.
 {¶ 39} Following affirmance of his conviction, the defendant sought federal habeas corpus relief, arguing that the exclusion of his mother from the courtroom violated his Sixth Amendment right to a public trial. The district court noted that a defendant's right to a public trial "`has always been interpreted as being subject to the trial judge's power to keep order in the courtroom.'" Id., quoting Cosentino v.Kelly, 102 F.3d 71, 73 (2d Cir. 1996), quoting United States ex rel.Orlando v. Fay, 350 F.2d 967, 971 (2d Cir. 1965). The court further averred that "`[i]t is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated.'" Shepard, supra, quoting Illinois v. Allen (1970),397 U.S. 337, 343, 90 S.Ct. 1057. Further, the court stated that a trial court may exclude disorderly spectators after "`balanc[ing] between the requirement that the actions of the courts be open to public scrutiny and the need to have the trial proceed in an orderly manner.'"Shepard, quoting Fay, supra, at 971.
 {¶ 40} The district court then addressed the defendant's assertion that under Waller, the trial court, prior to removing the defendant's mother from the courtroom, should have asked the witness whether she was intimidated by the mother's actions. The court rejected the defendant's argument, holding that Waller "governs the closing of the courtroom to peaceable individuals or to the public at large." Shepard, quotingCosentino, supra, at 73. The court held that "[w]hen the exclusion is based on the actual misconduct of a spectator in open court, however, then the Waller test does not apply." *Page 16 Shepard, citing Cosentino. The court concluded that under the circumstances before it, where the record clearly established that the trial court excluded the defendant's mother from the courtroom to allow the trial to proceed in an orderly fashion, a reviewing court need not separately consider the Waller factors. Id.
 {¶ 41} In Perry, supra, the court employed a "triviality standard," not the Waller test, in a case where the trial court excluded the defendant's eight-year old son from the trial. During opening statements, the defendant's wife brought the child with her into the courtroom. The trial court suggested that the wife remove the child to prevent him from witnessing his father's trial. After a recess, the trial court averred that it had been notified that the defendant had instructed his wife to keep the child in court. The trial court, surmising that defendant urged the child's attendance solely to evoke sympathy from the jury, ordered the wife to remove the child from the courtroom. Upon defendant's protestation that his wife was his "support system," the trial court averred that the wife could return without the child. The wife apparently missed the first day of the defendant's three-day trial.
 {¶ 42} On appeal, the defendant contended that the reasons advanced by the court for its actions — to protect the child's welfare and to prevent the defendant from using the child to evoke juror sympathy — did not justify denying him his right to a public trial. The defendant further maintained that he objected to the removal and thus was entitled to harmless error review.
 {¶ 43} The court of appeals noted that both the defendant and the government had analyzed the issue under the four-part test developed inWaller. However, the court determined that the Waller test applies only if closing the courtroom implicates the *Page 17 
accused's Sixth Amendment right. Id. at 889, citing United States v.Ivester, 316 F.3d 995, 958 (9th Cir. 2003). While the court acknowledged the "special concern" for assuring the attendance of an accused's family members, Perry at 890, citing In re Oliver (1948),333 U.S. 257, 68 S.Ct. 449, the court further noted that some circuit courts "have recognized that there are certain instances in which [an] exclusion cannot be characterized properly as implicating the constitutional guarantee." Perry, quoting Braun v. Powell, 227 F.3d 908,918. Quoting Peterson v. Williams, 85 F.3d 39 (2d Cir. 1996), thePerry court noted that "[e]ven a problematic courtroom closing can be `too trivial to amount to a violation of the [Sixth] Amendment." The court explained the "triviality standard" as follows:
 A triviality standard, properly understood, does not dismiss a defendant's claim on the grounds that the defendant was guilty anyway or that he did not suffer `prejudice' or `specific injury.' It is, in other words, very different from a harmless error inquiry. It looks, rather, to whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant — whether otherwise innocent or guilty-of the protections conferred by the Sixth Amendment.
Id., quoting Peterson at 42.
 {¶ 44} The Perry court stated that "[a] courtroom closing is `trivial' if it does not implicate the `values served by the Sixth Amendment' as set forth in Waller." Id. The court further averred that "`[e]ven the exclusion of a family member or friend may, in rare circumstances * * *, not implicate the Sixth Amendment public trial guarantee.'" Id., quotingCarson v. Fischer, 421 F.3d 83, 93 (2d Cir. 2005). Applying the "triviality standard," the court concluded that the trial court's action did not violate the Sixth Amendment because the trial remained open to the public, including defendant's wife, the child was the only person excluded from the proceedings, and the child's presence in the *Page 18 
courtroom would not serve the purposes of the right to public trial, i.e., ensuring that the judge and prosecutor carry out their duties responsibly, discouraging perjury, or encouraging witnesses to come forward. Perry.
 {¶ 45} Although we are not bound by these federal court decisions, we find these authorities to be persuasive. Shepard is particularly applicable to the instant case, in that it, too, involved exclusion of an accused's relative from a courtroom following an assertion by a court officer that the relative had made threatening gestures toward a witness while the witness testified. We agree with the holding inShepard that when the exclusion is based on misconduct by the spectator, the Waller test does not apply. Moreover, none of the cases cited by appellant involved the exclusion of a single spectator based upon that spectator's misconduct in open court.
 {¶ 46} Further, the Shepard holding is based upon sound reasoning that is applicable here. As the court noted, Waller involved closure of a courtroom to "peaceable individuals" and the "public at large." It did not address a situation where one unruly spectator is expelled for engaging in improper, menacing conduct and the "public at large" and other "peaceable individuals" are permitted to remain. Further, the purposes of the right to public trial, i.e., ensuring that the judge and prosecutor perform their duties responsibly, discouraging perjury, or encouraging witnesses to come forward, so essential to theWaller court's analysis, are not abridged where, as here, the trial remains open to the public, including the media, and the only person excluded from the proceedings is the disruptive spectator.
 {¶ 47} Perry also supports the conclusion that the Waller test is inapplicable under these circumstances. As previously noted, thePerry court stated that the exclusion of an *Page 19 
accused's family member may not, under certain circumstances, implicate the Sixth Amendment public trial guarantee. We believe that the "rare circumstances" to which the Perry court alludes encompass a situation where a family member makes threatening gestures toward a witness in open court, especially where the disruptive spectator was the only person excluded from the proceedings, and the trial remained open to the public, including other family members of the accused and the media.
 {¶ 48} Thus, in accord with Shepard and Perry, we hold that when the record clearly establishes that a trial court, after balancing the need for an open, public trial with the orderly administration of justice, excludes a spectator who engages in misconduct in open court, a reviewing court need not separately consider the four-part Waller test. As in Shepard, the record here establishes that the trial court's exclusion was based on misconduct of a spectator in open court; as such, we need not separately consider the Waller criteria.
 {¶ 49} Moreover, we find that the trial court's interest in maintaining courtroom security and protecting witness safety supported the trial court's ejection of the offending spectator. As noted, the prosecutor informed the court that the courtroom deputy had reported that defendant's family member made a threatening gesture toward Crump during his testimony. The trial court is certainly entitled to rely upon the assertions of court officers such as the prosecutor and deputy sheriff. Further, defense counsel's response suggests that he did not doubt the prosecutor's assertion; indeed, although defense counsel admitted that he did not see the gesture and had not spoken to the deputy, he nonetheless stated that he had "cautioned [his] people." We presume defense counsel meant that he had cautioned those courtroom observers associated with *Page 20 
defendant to refrain from exhibiting similar behavior. Defense counsel's admonishment suggests that he considered the matter to be extremely serious, thereby justifying the trial court's decision to ratify the deputy's removal of appellant's family member.
 {¶ 50} While we acknowledge the "special concern" for permitting a defendant's family member to attend a trial, see Drummond, supra, at ¶ 56, citing Oliver, supra, that special concern is overridden by the family member's misconduct. The trial court did not issue a blanket closure of the courtroom, but instead ordered only the removal of the person who made the threatening gesture. Although the trial court admonished the remaining spectators, it did not expel them from the courtroom.
 {¶ 51} In addition, the general public and the media viewed the trial. As noted in Drummond, the presence of the media helps safeguard an accused's right to a public trial. Id. at ¶ 55. Further, the transcript of the trial became a public record. Id.; Grant, at ¶ 17.
 {¶ 52} Contrary to appellant's intimation, a trial court is not required to hold an evidentiary hearing before deciding courtroom closure issues. United States v. Sherlock (C.A.9, 1992), 962 F.2d 1349,1358. We particularly find a hearing unnecessary where, as here, a court officer reports that a spectator made a threatening gesture toward a testifying witness during open court. Furthermore, appellant cites no authority, and we have found none, requiring a trial court to voir dire the jury in order to ascertain whether it observed the offending conduct or whether that conduct affected its deliberations.
 {¶ 53} In conclusion, we find that there was a substantial reason for the very limited, narrowly tailored courtroom closure. Where, as here, there is an interest in maintaining courtroom order and security, the trial court did not abuse its discretion in *Page 21 
ordering the removal of a single disorderly spectator. Accordingly, we hold that the trial court did not violate appellant's constitutional right to a public trial. Based upon the foregoing, we overrule appellant's first assignment of error.
 {¶ 54} Appellant contends in his second assignment of error that he received ineffective assistance of counsel at trial. To demonstrate ineffective assistance of counsel, a criminal defendant must meet a two-part test. Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052. Initially, a defendant must show that counsel's performance was deficient. Id. This requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel guaranteed the defendant by the Sixth Amendment." Id. Appellant has the burden of overcoming the strong presumption that trial counsel's performance was adequate or that counsel's action might be sound trial strategy.State v. Smith (1985), 17 Ohio St.3d 98, 100. "Ultimately, the reviewing court must decide whether, in light of all the circumstances, the challenged act or omission fell outside the wide range of professionally competent assistance." State v. DeNardis (Dec. 19, 1993), 9th Dist. No. 2245, citing Strickland, at 689.
 {¶ 55} A defendant must then show that counsel's deficient performance prejudiced the defense. Strickland. This requires a demonstration that "there exists a reasonable probability that, were it nor for counsel's errors, the result of the trial would have been different." State v.Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, at 694.
 {¶ 56} Appellant first asserts that defense counsel was ineffective in failing to contest the removal of appellant's family member from the proceedings. More *Page 22 
specifically, appellant argues that defense counsel's "blind acceptance" of the prosecutor's claim that appellant's family member made a threatening gesture at Crump, coupled with defense counsel's failure to request that the trial court query the jurors to determine if any of them were aware of the incident, and, if so, whether it affected their ability to render a fair and impartial verdict, fell below an objective standard of reasonableness. (Appellant's brief, at 12.) Appellant further contends he was prejudiced by defense counsel's failures because if the jurors observed the incident, there was "a reasonable likelihood that they would have felt fear or at a minimum, negative feelings about the defendant or his family. In a close case such as this, where there is clearly not overwhelming evidence of guilt, this type of unchecked occurrence could easily have swayed a jury member." Id.
 {¶ 57} Because we have concluded that the trial court did not err in barring the offending spectator from the courtroom for the remainder of appellant's trial, defense counsel was not ineffective for failing to object to the removal. To the extent that appellant challenges the factual basis for the removal (i.e., the threatening gesture), his challenge is pure speculation. Nothing in the record supports appellant's suggestion that the removed spectator did not make the threatening gesture. Moreover, a challenge to the removal or an inquiry of whether any of the jurors noticed the conduct of the spectator would have drawn more attention to the incident. Therefore, defense counsel's failure to object or to pursue further inquiry may have been a trial tactic. Implementation of a reasonable trial tactic will not support a claim of ineffective assistance of counsel. State v. Gumm (1995),73 Ohio St.3d 413, 428. Strategic trial decisions are left to the deference of trial counsel and may not be second-guessed by reviewing courts.State v. Carter *Page 23 
(1995), 72 Ohio St.3d 545, 558. Accordingly, appellant has not shown that his trial counsel's performance was deficient.
 {¶ 58} Further, appellant has failed to demonstrate how trial counsel's failure to object to the removal of the spectator would have resulted in a different trial verdict. Nothing in the record indicates that any juror observed the threatening gesture. Discussion between counsel and the trial court regarding the removal of the spectator was conducted outside the presence of the jury. Thus, appellant's assertions are pure speculation.
 {¶ 59} Appellant next contends that trial counsel was ineffective in failing to request that a juror who expressed her fear of appellant during the trial be removed from the jury. We disagree.
 {¶ 60} The day before he was scheduled to testify, Crump sat in the spectator area of the courtroom and presumably heard the testimony of other prosecution witnesses. The prosecutor notified the trial court of the situation, and, following a discussion with defense counsel, the court resolved the issue to the satisfaction of both parties.
 {¶ 61} The next day, one of the jurors alerted the jury commissioner that she had recognized a courtroom spectator the previous day and that she was "anxious" about it and wanted to report it to the court. (Tr. 569.) The trial judge told the jury commissioner he would deal with the situation "when the other lawyers are present along with the court reporter." Id. When the juror questioned appellant's attendance at that inquiry, the trial court explained that appellant had a right to be present. The juror then asked if the names of the jurors were provided to anyone other than the judge. The court responded that because jury service is a matter of public record, anyone so inclined could ascertain *Page 24 
juror's names; however, neither the court nor counsel would provide individual juror names.
 {¶ 62} Seemingly satisfied with that response, the juror averred that during the previous day's testimony, a person she recognized from her childhood as a "class clown" sat on the "defense side" side of the courtroom; as such, she felt obligated to report the incident. (Tr. 572.) She described the person as wearing a beige shirt and a goatee and that she believed his name to be Tony or Anthony.
 {¶ 63} The prosecutor determined that the person to whom the juror referred was Crump. Upon questioning by the court, the prosecutor, and defense counsel, the juror indicated that her limited affiliation with Crump would not affect her ability to fairly and impartially evaluate his testimony; she also stated that she was neither intimidated nor threatened by him. She further indicated that she notified the court after she realized she might know him because she was afraid that her failure to recognize his name during the voir dire process would later become an issue.
 {¶ 64} Upon further questioning by defense counsel, the juror averred that "not knowing the purpose of him being in the courtroom, and then him being familiar to me, I guess it concerned me, my concerns arose because if he knows me, depending on the outcome of the trial from the issues from whatever purpose he is in the courtroom for, it made me nervous him coming in here and not to mention he is a familiar face and not knowing the proceedings of the court." (Tr. 576-577.) When defense counsel asked if she was "just concerned about if he knew you and if there would be any fallout from the decision from you and your fellows jurors, and if he recognized you," the juror responded, "[y]es, that is a concern, but being this is a collective decision." (Tr. 577.) She reiterated *Page 25 
that she did not feel threatened and that she could fairly and impartially decide the case. She further indicated she wanted to continue to serve on the jury. Neither the prosecutor nor defense counsel objected to the juror's continued service, and the trial court resolved to keep the juror on the panel.
 {¶ 65} Appellant has failed to meet his burden regarding trial counsel's alleged deficient performance in failing to object to the juror's continued service on the jury. Initially, we are not persuaded that the juror's questions about appellant's presence during the inquiry and whether her name would be provided necessarily inferred that she feared appellant. The juror never stated that she feared appellant and seemed satisfied by the trial court's explanation regarding his presence at the inquiry. The juror's concerns seemed to be centered on Crump, not appellant. In addition, defense counsel thoroughly questioned the juror.
 {¶ 66} Further, appellant has failed to demonstrate how trial counsel's failure to object to the juror's continued service would have resulted in a different trial verdict. The juror repeatedly stated that she could fairly and impartially decide the case. As the record contains no evidence suggesting that the juror feared or was biased against appellant, we cannot find that there was any reason to remove the juror from the panel. Accordingly, we find no prejudice to appellant from trial counsel's failure to object to this juror remaining on the panel. The second assignment of error is overruled.
 {¶ 67} Appellant contends in his third assignment of error that the trial court erred in admitting the audiotape recordings of his jail calls. Appellant contends this evidence was irrelevant, did not indicate consciousness of guilt as argued by appellee, and, even if relevant, was more prejudicial than probative. Appellant maintains the improper *Page 26 
admission of this evidence denied him his right to due process and a fair trial as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 10, and 16
of the Ohio Constitution. We disagree.
 {¶ 68} On the day trial was to commence, appellant filed a motion in limine seeking to preclude appellee from introducing the recordings of his jail calls, any testimony pertaining to those calls, or both. Appellant argued that the calls were irrelevant to the issues in the case, and, even if relevant, were inadmissible under Evid. R. 403(A) because their probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.
 {¶ 69} The trial court held a hearing at which appellee played recordings of portions of numerous calls made by appellant between May 19, 2005 and May 31, 2005, and July 13, 2005 and July 27, 2005. Over appellant's objections, the trial court ruled that it would permit appellee to introduce excerpts of a few selected calls in its case-in-chief.
 {¶ 70} At trial, appellee played the allowed excerpts for the jury. In the first excerpt, appellant stated: "I was no where in the area. I don't know it's crazy," to which an unidentified female responded, "You shouldn't of [sic] been down there period." Appellant again stated, "I wasn't in the area." (Tr. 180 Insert.)
 {¶ 71} In the second excerpt, an unidentified female asked appellant, "Where were you at, at the time[?]." Appellant responded, "Not in the area, that's for damn sure. I saw the shit on the news. I was down at Suzy Q's, right there on 17th and 4th * * * (inaudible) pool hall with Brian." Later in the same conversation, the female asked appellant, "And *Page 27 
do you even have anybody that will * * * say that you were with [them]." Appellant responded, "Yeah, Brian. * * * Just me and him * * * Nobody else." (Tr. 186 Insert.)
 {¶ 72} In the third excerpt, appellant and an unidentified male conversed, as follows:
 [Appellant]: What's the deal with that nigger though
 Male: Who, Who
 [Appellant]: You know who I'm talkin[g] about
 Male: Yeah, oh yeah. I don't know. Come talkin[g] about, he came back around the corner. You heard what they said didn't ya.
 [Appellant]: Yeah
 * * *
 [Appellant]: That nigger wasn't no where near the area.
 Male: He talkin[g] about he came back around the corner and seein you
 [Appellant]: Of course
 Male: Who was with him
 [Appellant]: His cousin
 Male: Who is this
 [Appellant]: Pako, old thieven ass nigger
(Tr. 196 Insert.)
 {¶ 73} The conversation continued, as follows:
 Male: They aint had nothin[g] to do with it
 [Appellant]: Aint had nothing *Page 28 
 Male: All he gotta to do is say I don't know who the fuck it was
 [Appellant]: Um, hum
 Male: That's all you had to do
 [Appellant]: That's cause it's some he said * * * he saw you. So what
 Male: Just cause he scared talkin[g] about (inaudible)
 [Appellant]: Yeah, go ask the mother fucker that saw it
 Male: Deny that shit
 [Appellant]: Yeah
 Male: But that bitch had to tell it, you know
 [Appellant]: Fuck [him]
(Tr. 198 Insert.)
 {¶ 74} In the fourth excerpt, appellant, speaking to an unidentified male, stated, "I was cooking out in the back yard[.] I never left." The man responded, "There was a lot of people there." Appellant agreed and named several men who allegedly attended the cookout. (Tr. 222 Insert.)
 {¶ 75} In the fifth and final excerpt, an unidentified male stated "* * * Neither one of [them] seen nothing * * * ." Appellant responded, "Nothing. * * * All they saw was me standing on the porch." (Tr. 233 Insert.)
 {¶ 76} The prosecutor replayed these excerpts during his rebuttal closing argument, contending that in the first, second, fourth, and fifth excerpts, appellant made conflicting statements regarding his whereabouts during the time the crime was committed and that these inconsistencies established appellant's consciousness of guilt. *Page 29 
In addition, although the trial court sustained defense counsel's objection to the prosecutor's contention that appellant was talking about Crump when he asserted in the third excerpt that "that nigger" was "nowhere in the area," the prosecutor thereafter argued that appellant's later assertion about "his cousin" referred to Crump's cousin, Andre Brown. The prosecutor contended that appellant's knowledge of Brown's presence in Crump's SUV established that it was appellant who conversed with the occupants of the SUV during the stop across from the carryout and, then later, according to Fares, entered the carryout and shot Jones.
 {¶ 77} A trial court has broad discretion in determining the admissibility of evidence. State v. Maurer (1984), 15 Ohio St.3d 239,265, citing State v. Hymore (1967), 9 Ohio St.2d 122, 128. Accordingly, an appellate court should not interfere with a trial court's evidentiary rulings absent an abuse of discretion. Id. "An abuse of discretion `connotes more than an error of law or of judgment; implies that the court's attitude is unreasonable, arbitrary or unconscionable."State v. Jackson, 107 Ohio St.3d 53, 2005-Ohio-5981, at ¶ 181, quotingState v. Adams (1980), 62 Ohio St.2d 151, at 157.
 {¶ 78} Evid. R. 401 defines "relevant" evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, all relevant evidence is admissible, and irrelevant evidence is inadmissible. Evid. R. 402. The statements at issue are clearly relevant, as they concern appellant's possible involvement in the crime.
 {¶ 79} Further, a criminal defendant's out-of-court statement, offered against the defendant by the state, is admissible pursuant to Evid. R. 801(D)(2)(a). State v. Johnson, *Page 30 
Butler App. No. CA2002-04-100, 2003-Ohio-2540, at ¶ 21. This rule permits the admission of such evidence when it is "offered against a party" and is the party's "own statement." It is uncontroverted that the recordings at issue were made from telephone calls originated by appellant while he was in jail awaiting trial and that the voice on the recordings is that of appellant; thus, the statements are admissible.
 {¶ 80} Appellant contends that the trial court erred in failing to exclude the statements pursuant to Evid. R. 403(A), which provides that otherwise relevant evidence is inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." A trial court, however, has broad discretion to determine whether relevant evidence must be excluded in accordance with Evid. R. 403(A) because "`the exclusion ofrelevant evidence under Evid. R. 403(A) is even more of a judgment call than determining whether the evidence has logical relevance in the first place.'" (Emphasis sic.) State v. Cromartie, Medina App. No. 06CA0107-M,2008-Ohio-273, ¶ 18, quoting State v. Yarbrough, 95 Ohio St.3d 227,2002-Ohio-2126, at ¶ 40.
 {¶ 81} After a thorough review of the record in this case, including the transcript of the hearing on the motion in limine, we cannot find that the trial court abused its discretion in admitting the statements. At that hearing, the trial court diligently listened to each of the statements appellee sought to admit and heard extensive arguments from both parties as to each statement. The court meticulously culled the list to the five excerpts at issue and thoroughly explained its rationale for admitting them. Indeed, the court excluded several statements that arguably cut in favor of appellee. Because reasonable people could reach different conclusions regarding whether appellant's statements reflect *Page 31 
inconsistencies in his whereabouts at the time of the murder, we find that the trial court did not abuse its discretion by admitting this relevant evidence. Nor did the trial court abuse its discretion by concluding that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice.
 {¶ 82} Further, appellee played the calls at the end of the trial. Therefore, the jury was able to assess the calls in the context of all the evidence. As such, the jury could reasonably infer that appellant made conflicting statements as to his location at the time of the murder, thereby indicating that he was attempting to establish a false alibi. A criminal defendant's attempt to create a false alibi "strongly indicates consciousness of guilt." State v. Issa, 93 Ohio St.3d 49, 67, quoting State v. Campbell (1994), 69 Ohio St.3d 38, 47. Similarly, the jury could reasonably infer that appellant's statements regarding "his cousin" established that he knew Crump's cousin, Brown, was in the SUV because he conversed with the occupants during the stop across from the carryout.
 {¶ 83} In light of the foregoing, we overrule appellant's third assignment of error.
 {¶ 84} Appellant contends in his fourth assignment of error that his murder conviction is not supported by sufficient evidence and is against the manifest weight of the evidence. We disagree.
 {¶ 85} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different."State v. Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus. "`[S]ufficiency is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" Id. at 386, quoting Black's Law Dictionary (6 Ed. 1990) 1433. "In essence, sufficiency is a *Page 32 
test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." Id., citing State v. Robinson (1955),162 Ohio St. 486.
 {¶ 86} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.
 {¶ 87} In contrast, "[w]eight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" (Emphasis sic). Thompkins, supra, at 387. "Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis sic). Id., citing Black's Law Dictionary (6 Ed. 1990), at 1594.
 {¶ 88} When an accused asserts that his conviction is against the manifest weight of the evidence, "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id., citingState v. Martin (1983), 20 Ohio App.3d 172, 175. "The only special deference given in a manifest-weight review attaches to the conclusion reached by the trier of fact." Id. at 390, citing State v. DeHass
(1967), 10 Ohio St.2d 230, paragraph one of the syllabus. (Cook, J., concurring.) *Page 33 
 {¶ 89} Finally, although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. State v. Braxton, Franklin App. No. 04AP-725,2005-Ohio-2198, at ¶ 15, citing State v. Roberts (Sept. 17, 1997), Lorain App. No. 96CA006462. "[T]hus, a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." Id. In that regard, we will first examine whether appellant's conviction is supported by the manifest weight of the evidence.
 {¶ 90} R.C. 2903.02(A) proscribes murder, as follows: "[n]o person shall purposely cause the death of another * * *." The evidence presented by the state conclusively established that the perpetrator of the crime purposely caused the death of the victim by shooting him several times at point blank range; thus, the sole issue to be resolved by the jury was the identity of the perpetrator.
 {¶ 91} Crump testified that appellant approached Crump's SUV while Crump was stopped across the street from the carryout. Crump and his cousin spoke with appellant. Fares testified that the person who conversed with the occupants of the SUV walked across the street, entered the carryout, purchased a cigar, and shot Jones on his way out of the carryout. From this evidence, the jury could reasonably infer that appellant was the person who committed the murder. Further, in the calls appellant made from jail, he arguably made conflicting statements as to his whereabouts at the time of the murder. As noted previously, the jury could reasonably infer that appellant's conflicting statements established that he was attempting to create a false alibi. The jury could also reasonably infer that the statement regarding the "cousin" referred to Crump's cousin, Andre Brown, *Page 34 
and that appellant's knowledge of Brown's presence in the SUV established that he was the person who spoke with Crump and Brown across the street from the carryout and later entered the carryout and shot Jones.
 {¶ 92} We recognize that the state's evidence in this case is entirely circumstantial. However, it is well-established that circumstantial evidence possesses the same probative value as direct evidence.State v. Treesh (2001), 90 Ohio St.3d 460. The jury unanimously convicted appellant of the crime. As noted previously, the jury's verdict is entitled to special deference in a manifest-weight review.Thompkins, supra, at 390. (Cook, J., concurring.) Indeed, "[o]n the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." DeHass, supra, at paragraph one of the syllabus. Based upon the record before us, we cannot conclude the jury lost its way and created a manifest miscarriage of justice in arriving at its verdict. Therefore, the guilty verdict was not against the manifest weight of the evidence.
 {¶ 93} We also find that after viewing the evidence in a light most favorable to the State, a rational trier of fact could find the essential elements of the crime proven beyond a reasonable doubt. Therefore, the murder conviction is supported by sufficient evidence. The fourth assignment of error is overruled.
 {¶ 94} Finally, appellee has filed a motion for leave to appeal pursuant to App. R. 5(C). Appellee seeks leave to appeal evidentiary rulings made by the trial court excluding portions of the audiotaped telephone calls appellant made from jail. To that end, appellee has asserted the following cross-assignment of error: "The trial court abused its discretion in excluding recordings of appellant's jail calls." Appellee asserts that its cross-assignment *Page 35 
of error is conditional and need not be ruled upon if this court affirms appellant's conviction. Having affirmed appellant's conviction, we deny appellee's motion for leave to appeal.
 {¶ 95} For the foregoing reasons, we overrule appellant's first, second, third, and fourth assignments of error and affirm the judgment of the Franklin County Court of Common Pleas. Accordingly, we deny appellee's motion for leave to appeal.
Judgment affirmed.
McGRATH, P.J., concurs. WHITESIDE, J., dissents.
WHITESIDE, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.