# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 13, 2006       Decided March 16, 2007

No. 05-3119

UNITED STATES OF AMERICA,
APPELLEE

v.

ANTOINE MICHAEL PERRY,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 03cr00329-01)

*Richard K. Gilbert*, appointed by the court, argued the cause for the appellant.

*John P. Gidez*, Assistant United States Attorney, argued the cause for the appellee. *Kenneth L. Wainstein*, United States Attorney at the time the brief was filed, and *Roy W. McLeese, III*, *Anthony M. Alexis*, and *David B. Goodhand*, Assistant United States Attorneys were on brief.

Before: HENDERSON, RANDOLPH and GRIFFITH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

2

KAREN LECRAFT HENDERSON, *Circuit Judge*: The appellant, Antoine Perry, was convicted of unlawful accessing a computer resulting in damage in violation of 18 U.S.C. § 1030(a)(5)(A)(i).[1] He appeals, asserting that the district court committed three errors: (1) it ordered Perry's wife and eight-year-old son removed from the courtroom during Perry's trial; (2) it *sua sponte* instructed the jury to disregard Perry's wife's failure to testify; and (3) it failed to read the complete jury instructions to the jury. For the reasons set forth below, we reject Perry's claims and affirm his conviction.

**I.**

Lockheed-Martin (Lockheed) provides computer support services to the Office of Site Remediation Enforcement (OSRE), a division of the Environmental Protection Agency (EPA). OSRE links its computers through a local area network (LAN) that connects its employees to its file server. The LAN allows OSRE employees to create and edit their documents, access databases and send e-mails to co-workers.

In September 1999, Perry was a computer network systems administrator for Norell, a subcontractor of Lockheed. In that capacity, Perry helped to maintain the connection between the file server and the LAN and was given remote access to the network, allowing him to remotely control server operations. On September 10, 1999, Lockheed offered Perry a job as a network administrator. Because Perry failed Lockheed's mandatory employee drug test, however, Lockheed rescinded its offer on Friday, September 24, 1999, and also informed Perry that he could no longer work on the EPA contract. Lockheed's

---

[1]The crime is committed by anyone who: "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer." 18 U.S.C. § 1030(a)(5)(A)(i).

action was effective immediately and Lockheed security escorted him out of Lockheed's main office building. One witness described him as "angry." Tr. I, 2/3/04 at 103.

On the following Monday, September 27, 1999, OSRE employees arrived at work and discovered that they could not log on to the file server. After investigating, a LAN systems manager determined that someone using the fictitious username "Mburton" had disabled the server via remote access, changed passwords and deleted printers from the network system.[2] The systems manager concluded a security breach had occurred and he then shut down the server, replaced its hardrives and reloaded its software. As a result of the server problems and maintenance, OSRE employees could not access work-related documents and e-mails for more than one day.

A Lockheed network design engineer eventually traced the remote connection used to disable the server to Perry's Maryland home telephone number. On October 13, 1999, agents from the EPA Inspector General's Office and the FBI searched Perry's house and confiscated, *inter alia*, a desktop computer, a laptop computer, several hard drives and a modem. The FBI also seized a list of the printers and print services within the EPA's computer system. On July 30, 2003, Perry was charged in a one-count indictment with unauthorized access to a computer causing damage.

Perry's trial began on February 2, 2003, with jury selection. The next day, inclement weather resulted in school closings throughout the District and Perry's wife brought their eight-year-old son to court. Before opening arguments began and out of the jury's presence, the trial judge suggested that Perry's wife remove the child to prevent him from witnessing his father's

---

[2]OSRE employed no one named "M. Burton" and gave no one permission to create an "Mburton" account.

trial. The judge stated, "Of course [Perry's son] and his mother have every right to be here . . . [but] I'm always concerned about the effect of these types of proceedings on children, especially children of tender years . . . I'm not ordering you to leave." Tr. I, 2/3/04 at 17-19. The judge then declared a recess to "give everyone a chance to relocate." *Id.* at 20. After the recess, however, the judge declared, "It was reported to me over the recess that Mr. Perry instructed his wife to keep the child in court. There's no doubt in this Court's mind that such an effort on his part is made solely to evoke sympathy on the part of the jurors." *Id.* The judge then ordered Perry's wife to remove the boy from the courtroom. Perry replied, "Your Honor, that's my wife. That's my support system," to which the judge responded, "Your support system can return without your son, sir." *Id.* at 21. After the judge repeated his belief that Perry sought to keep his son in court only to evoke juror sympathy, Perry stated, "That was not the reason, Your Honor." *Id.* Perry's wife then left the courtroom with the child.

The trial proceeded with the Government presenting evidence to establish that Perry disabled OSRE's file server under the username "Mburton" by informing the jury, *inter alia*, that Perry's wife's name is "Tonya Marie Burton Perry."[3] After closing arguments, the judge asked counsel from both sides if they wanted him to instruct the jury to refrain from speculating regarding Perry's wife's failure to testify. The judge declared, "[Perry's wife's] name has been mentioned prominently in this case. The last thing in the world I want . . . is for there to be a verdict followed by a questioning session that reveals that . . . [the jury was] troubled because her name was used and she was here and she didn't testify." Tr. II, 2/4/04 at 81. Perry's counsel

---

[3]During the search of Perry's house, the FBI seized a certificate awarded to "Tonya Burton" in recognition of her completion of jury duty. Tr. II, 2/3/04 at 118.

objected, arguing that "the mere mention of that instruction may actually put th[e] thought [that Perry's wife was involved in the crime] in [the jurors'] minds." *Id.* at 82. He further argued that he "[did not] see a need to raise a possible issue with respect to [Perry's wife]," *id.* at 85, because Perry's defense was "technical and forensic, as opposed to personal," *id.* at 90. Nevertheless, the judge instructed the jury, "You are instructed as a matter of law not to speculate as to any reason why Mr. Perry's wife did not testify in this case. That's not an issue in this case." *Id.* at 101.

Before charging the jury on the elements of the offense, the judge declared, "I'm just going to focus on the elements of the offense, Counsel. I'm going to send the entire instruction back. . . . There are definitions. Loss is defined, computer's defined. There's a statute defining the offense. I'm not going to read that to you. You can read it . . . I want to focus on the elements." *Id.* at 105. Neither party objected to his decision not to read aloud to the jury the definitions included in the written charge. The jury convicted Perry and the judge sentenced him to four months' incarceration and three years' supervised release. He also ordered Perry to pay restitution in the amount $5,000 and a special assessment of $100. Perry filed a timely notice of appeal on July 15, 2005.

## II.

We address separately Perry's Sixth Amendment claim and his two challenges to the jury instructions.

### A. Sixth Amendment Claim

Perry argues that the district court violated the Sixth Amendment to the United States Constitution when it removed his wife and child from the courtroom. Specifically, he contends that the reasons given by the court for its action—to protect the child's welfare and to prevent Perry from using the child to evoke juror sympathy—did not justify denying him his right to

a public trial. In addition, Perry maintains that he objected at trial to the removal and thus is entitled to harmless error review. *See United States v. Perkins*, 161 F.3d 66, 72 (D.C. Cir. 1998) (citing Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.")). The Government responds that the district court did not err and that we should review his claim under the plain error standard because he failed to object at trial. *See United States v. Spriggs*, 102 F.3d 1245, 1260 (D.C. Cir. 1996) (Per Curiam) (citing Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.")). We need not decide the correct standard of review, however, because the district court committed no error at all.

The Sixth Amendment provides in part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const. amend. VI. As the Supreme Court explained in *Waller v. Georgia*, the right to a public trial: (1) "ensure[s] that judge and prosecutor carry out their duties responsibly," (2) "encourages witnesses to come forward" and (3) "discourages perjury." 467 U.S. 39, 46 (1984). Indeed, "the guarantee has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution." *In re Oliver*, 333 U.S. 257, 270 (1948).

Both Perry and the Government analyze the removal of Perry's child from the courtroom under the four-prong test developed in *Waller*. *See* Appellant's Br. at 32-36; Appellee's Br. at 17-23. In *Waller*, the trial court had "ordered [a] suppression hearing closed to all persons other than witnesses, court personnel, the parties, and the lawyers." 467 U.S. at 42. In reversing that decision, the Supreme Court held that notwithstanding the fact that a defendant has a Sixth Amendment right to a *public* suppression hearing, the right "may give way in certain cases to other rights or interests." *Id.*

at 45. Ultimately, the complete closing of a criminal proceeding is constitutional only if:

> [1] the party seeking to close the hearing . . . advance[s] an overriding interest that is likely to be prejudiced, [2] the closure [is] no broader than necessary to protect that interest, [3] the trial court . . . consider[s] reasonable alternatives to closing the proceedings, and [4] it . . . make[s] findings adequate to support the closure.

*Id.* at 48. Because the trial court's complete closing of the suppression hearing was "plainly . . . unjustified," the Court remanded for a new hearing.[4] *Id.* at 48, 50.

The *Waller* test applies, however, only if closing the courtroom implicates the defendant's Sixth Amendment right. *United States v. Ivester*, 316 F.3d 955, 958 (9th Cir. 2003) ("Before applying the *Waller* test to determine whether the

---

[4]While we have not addressed the issue, the Government points out that several circuits require that the prosecution advance only a "substantial" interest—not an "overriding" interest—to support a "partial" closing because "partial closures do not implicate the same fairness and secrecy concerns as total closures." *United States v. Osborne*, 68 F.3d 94, 99 (5th Cir. 1995) (exclusion of co-defendant's sister and "new spectators" during testimony of one witness upheld); *see also United States v. Farmer*, 32 F.3d 369, 371-72 (8th Cir. 1994) (exclusion of all spectators except victim's family while victim testified upheld); *Woods v. Kuhlmann*, 977 F.2d 74, 76 (2d Cir. 1992) (exclusion of defendant's common law wife, his common law wife's sister and his cousin during one witness's testimony upheld); *Nieto v. Sullivan*, 879 F.2d 743, 753 (10th Cir. 1989) (exclusion of defendant's sisters and other unspecified relatives during one witness's testimony upheld); *United States v. Sherlock*, 962 F.2d 1349, 1356-57 (9th Cir. 1989) (exclusion of defendants' unspecified family members during victim's testimony upheld); *Douglas v. Wainwright*, 739 F.2d 531, 533 (11th Cir. 1984) (exclusion of members of general public during one witness's testimony upheld).

district court violated [the defendant's] Sixth Amendment right to a public trial, we must first determine whether the right attaches . . . .") (citation omitted). While "[d]etermining with any precision the contours of th[e] right [to a public trial] is a difficult task," *Braun v. Powell*, 227 F.3d 908, 917 (7th Cir. 2000), the Supreme Court has suggested, albeit in dicta, that the right to a public trial entitles a criminal defendant "at the very least . . . to have his friends, relatives and counsel present, no matter with what offense he may be charged." *In re Oliver*, 333 U.S. at 272; *see also Braun*, 227 F.3d at 917 (describing "Supreme Court's requirement" that "friend[s] or relative[s] of the defendant" be allowed to attend trial); *Vidal v. Williams*, 31 F.3d 67, 69 (2d Cir. 1994) ("[T]he Supreme Court has specifically noted a special concern for assuring the attendance of family members of the accused."). Nevertheless, some circuits "have recognized that there are certain instances in which [an] exclusion cannot be characterized properly as implicating the constitutional guarantee." *Braun*, 227 F.3d at 918; *see also id.* at 919 (exclusion of member of jury venire not chosen to sit as juror did not implicate Sixth Amendment); *see also Carson v. Fischer*, 421 F.3d 83, 93 (2d Cir. 2005) (exclusion of defendant's ex-mother-in-law did not implicate Sixth Amendment); *Ivester*, 316 F.3d at 960 (exclusion of "spectators during the brief mid-trial questioning of the jurors to determine if they were concerned for their safety" did not implicate Sixth Amendment); *Peterson v. Williams*, 85 F.3d 39 (2d Cir. 1996) (inadvertent courtroom closing during defendant's brief testimony did not implicate Sixth Amendment). That is, even a problematic courtroom closing can be "too trivial to amount to a violation of the [Sixth] Amendment." *Peterson*, 85 F.3d at 42. The Second Circuit explained:

> A triviality standard, properly understood, does not dismiss a defendant's claim on the grounds that the defendant was guilty anyway or that he did not suffer

> "prejudice" or "specific injury." It is, in other words, very different from a harmless error inquiry. It looks, rather, to whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant—whether otherwise innocent or guilty—of the protections conferred by the Sixth Amendment.

*Id.* A courtroom closing is "trivial" if it does not implicate the "values served by the Sixth Amendment" as set forth in *Waller*. *Id.* (citing *Waller*, 467 U.S. at 46-47); *see also Braun*, 227 F.3d at 918-19. "[E]ven the exclusion of a family member or friend may, in rare circumstances . . . , not implicate the Sixth Amendment public trial guarantee." *Carson*, 421 F.3d at 94.

Using the triviality standard, we believe the district court's action did not violate the Sixth Amendment. Perry's son was the only person excluded from the proceedings[5] and an eight-year-old's presence in the courtroom would neither "ensure that judge and prosecutor carry out their duties responsibly" nor "discourage[] perjury." *Waller*, 467 U.S. at 46. Nor would the child's attendance "encourage [a] witness[] to come forward."

---

[5]Although the judge ordered Perry's wife to remove the child, he did not exclude her from the proceedings. Indeed, the judge twice informed Perry that she could return without their son. Tr. I, 2/3/04 at 21-22. While Perry appears to argue that the judge effectively excluded his wife because the school cancellation compelled her to stay with their child, *see* Appellant's Br. at 31, the record does not indicate that Perry so advised the court or that his wife was unable to make alternative arrangements. Moreover, the record indicates that the trial lasted from February 3rd (the day Perry's son was removed) until February 5th when the verdict was returned. *See* Tr. 2/3/04-Tr. 2/5/04. Perry suggests in his brief that his wife missed only the first day of trial. *See* Appellant's Br. at 30 ("[T]he fact remain [sic] in this case that Appellant's wife and child were excluded for *a* full day of testimony including essential government witnesses." (emphasis added)).

*Id.* Perry's trial remained open to the public—and specifically to his wife—throughout.

### B. Jury Instruction Regarding Wife's Failure to Testify

Perry next argues that the district court erred by instructing the jury "not to speculate as to any reason why Mr. Perry's wife did not testify in this case." Tr. II, 2/4/04 at 101. Because Perry objected to the instruction at trial, we review his claim under the harmless error standard. Fed. R. Crim. P. 52(a); *see also United States v. Logan*, 998 F.2d 1025, 1030 (D.C. Cir. 1993) ("To preserve an objection to jury instructions, a defendant must raise the specific objection before the trial court." (citing *United States v. Pryce*, 938 F.2d 1343, 1350 (D.C. Cir. 1991))). Under that standard, the Government bears the burden of proving an error is "harmless"—that is, not "prejudicial." *See United States v. Olano*, 507 U.S. 725, 734 (1993).

Although there appears to be little or no precedent specifically addressing a trial judge's decision to issue *sua sponte* a cautionary jury instruction to disregard the failure of an individual—other than the defendant—to testify, the Supreme Court has held that a similar *sua sponte* instruction to disregard a *defendant's* failure to testify over the defendant's objection does not violate the privilege against compulsory self-incrimination. *Lakeside v. Oregon*, 435 U.S. 333, 340-41 (1978). In so holding, the Court rejected the argument that such instruction would "encourage the jury to draw adverse inferences from a defendant's silence," stating that the argument rests on the "speculative assumptions" that "the jurors have not noticed that the defendant did not testify and will not, therefore, draw adverse inferences on their own" and that they "will totally disregard the instruction." *Id.* at 339-40. The Court concluded that, although "[i]t may be wise for a trial judge not to give such a cautionary instruction over a defendant's objection," the instruction does not violate the Fifth Amendment to the

Constitution.[6] *Id.* at 340-41; *see also United States v. Moss*, 756 F.2d 329, 334-35 (4th Cir. 1985) (affirming district court's decision to *sua sponte* instruct jury that "[t]he weight of the evidence is not necessarily to be determined by the number of witnesses testifying" over defendant's objection after defendant offered "no witnesses at trial").

While a cautionary jury instruction regarding a potential witness's failure to testify does not implicate the Fifth Amendment issue addressed in *Lakeside v. Oregon*, we agree with the Supreme Court's suggestion that a trial judge should refrain from *sua sponte* instructing the jury, as was done here, over the defendant's objection. *See Lakeside*, 435 U.S. at 340-41; *see also Moss*, 756 F.2d at 335. Defense counsel should have considerable latitude in weighing the effect of such an instruction, *cf. Strickland v. Washington*, 466 U.S. 668, 688 (1984) ("Counsel's function is to assist the defendant . . . [and] [c]ounsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process."), and, once he objects, the trial judge should carefully consider the objection.

Nonetheless, we are confident that Perry suffered no prejudice. Indeed, we would be speculating to conclude either that the instruction caused the jury to draw inferences adverse to Perry that it would not otherwise have drawn or that the jury did not follow the instruction. *Cf. Lakeside*, 435 U.S. at 340 (discussing instruction regarding defendant's failure to testify). Moreover, the judge emphasized to the jury that the reason for

---

[6]The Court also rejected the argument that the instruction violated the defendant's Sixth Amendment right to counsel by "interfering with counsel's trial strategy" because the judge gave a lawful instruction and "[i]t is the judge, not counsel, who has the ultimate responsibility for the conduct of a fair and lawful trial." *Lakeside*, 435 U.S. at 341-42.

Perry's wife's silence was not at issue in the case.  Tr. II, 2/4/04 at 101 ("That's not an issue in this case."); *cf. Moss*, 756 F.2d at 335 ("[T]he possible prejudice resulting from the number of witnesses instruction was lessened because the district court informed the jury in the same instruction that the government's large number of witnesses need not be considered 'persuasive at all.'").  Accordingly, the district court's instruction constitutes, at most, harmless error.

### C. Failure to Read Complete Jury Instructions

Finally, Perry argues that the district court erred by failing to read aloud the complete jury instructions.  Because Perry did not object at trial, we review his claim under the plain error standard.  *See* Fed. R. Crim. P. 52(b).  Under that standard, we will remedy a trial court error only if there is "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights[]' . . . [and] (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (quoting *Olano*, 507 U.S. at 732).  An error "affec[ts] substantial rights" if it is "prejudicial" or "affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734.

While we have not addressed the issue, both the Third Circuit and the Ninth Circuit have held that "[i]t is . . . essential that all instructions to the jury be given by the trial judge orally in the presence of counsel and the defendant." *United States v. Noble*, 155 F.2d 315, 318 (3d Cir. 1946); *accord Guam v. Marquez*, 963 F.2d 1311, 1314-15 (9th Cir. 1992).  In *Noble*, the court explained its reasoning:

> [T]he trial judge would not have fulfilled his duty . . . merely by sending the information out with the jury to read if they chose to do so . . . .  For not only are counsel and the defendant entitled to hear the instructions in order that they may . . . object to them and secure their

prompt correction by the trial judge, but it is equally important to make as certain as may be that each member of the jury has actually received the instructions.

*Noble*, 155 F.2d at 318; *see also Marquez*, 963 F.2d at 1314-15 (trial judge must read jury instructions aloud to jury for "reasons articulated . . . in *Noble*").

We agree with our sister circuits that a trial judge must read aloud jury instructions in their entirety. As the Ninth Circuit noted, the lack of case law on the subject most likely results from the fact that "judges and litigators have always assumed that jury instructions must be oral." *Marquez*, 963 F.2d at 1314. Accordingly, the district court erred in failing to read to the jury the definitions of "computer," "loss" and "individual."[7]

---

[7]Contrary to the Government's argument, Appellee's Br. at 30-31, the words do not constitute "words of general use," *United States v. Garza-Juarez*, 992 F.2d 896, 910 (9th Cir. 1993) ("A jury charge that does not include definitions of words of general use does not constitute plain error."); *see also Perkins*, 161 F.3d at 70 ("Although a trial court must define words and phrases that have technical or unconventional meanings, it is not required to define words which are in common use, and are such as are readily comprehended by persons of ordinary intelligence, where the words are applied in the judge's instructions in their conventional sense." (internal quotation omitted)). Both "computer" and "loss" have specific meanings set forth in the statute itself, *see* 18 U.S.C. § 1030(e)(1), (e)(11), the parties agreed that "loss" also "includes any natural and foreseeable result of any damage that . . . occurred," *see* Joint Proposed Statement of the Case, Voir Dire, Jury Instructions, and Verdict Form 12 (Jan. 29, 2004) (Jury Instructions), *reprinted in* Appellant's App. at 32 (citing *United States v. Middleton*, 231 F.3d 1207, 1213 (9th Cir. 2000)), and the parties agreed on a definition of "individual" derived from *Middleton*, 231 F.3d at 1212, *see* Jury Instructions, *supra*, at 32.

14

Perry has failed to demonstrate, however, that the judge's error "affected the outcome of the district court proceedings."[8] *Olano*, 507 U.S. at 734. In addition to the general charge relating to burden of proof, credibility of witnesses and the like, *see* Tr. II, 2/4/04 at 94, 97-98, the judge read to the jurors the portion of the charge explaining the essential elements of the charged offense,[9] *see id.* at 105-06, and failed to read only the definitions of three words referenced in the elements. There is little chance that the jurors failed to "actually receive[]," *Noble*, 155 F.2d at 318, the definitions because the judge orally instructed them to read the definitions in the written charge they had with them in the jury room, Tr. II, 2/4/04 at 105 ("There are definitions. Loss is defined, computer's defined. There's a statute defining the offense. I'm not going to read that to you.

---

[8]It is also not clear that the district court's error was "plain." An error is "plain" if it is "clear" or "obvious." *Olano*, 507 U.S. at 734. We have declared that "absent precedent from either the Supreme Court or this court . . . , [an] asserted error . . . falls far short of plain error." *United States v. Vizcaino*, 202 F.3d 345, 348 (D.C. Cir. 2000). Nonetheless, "[s]ome legal norms are absolutely clear (for example, because of the clarity of a statutory provision or court rule); in such cases, a trial court's failure to follow a clear legal norm may constitute plain error, without regard to whether the applicable statute or rule previously had been the subject of judicial construction." *United States v. Merlos*, 8 F.3d 48, 51 (D.C. Cir. 1993).

[9]"**(a)** Whoever . . . **(5)(A)(i)** knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected *computer* . . . and **(B)** by conduct described in clause (i), . . . . caused . . . **(i)** *loss* to 1 or more *persons* during any 1-year period . . . . aggregating at least $5,000 in value . . . ." 18 U.S.C. § 1030(a)(5) (emphases added). The "Elements of the Offense" section of the charge uses "individuals" rather than "persons" pursuant to the parties' agreement. Jury Instructions, *supra* n.7, at 31.

15

You can read it."). Even if the jurors did not read the definitions, "computer," "loss" and "individual" are simple terms and the jury instruction definitions differ immaterially from their dictionary meanings.[10] We conclude the district court did not plainly err in failing to read aloud the definitions of "computer," "loss" and "individual."

---

[10]*Compare* 18 U.S.C. § 1030(e)(1) ("computer" is "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device") *with* Webster's Third New International Dictionary 468 (1993) (Webster's) ("computer" is "a programmable electronic device that can store, retrieve, and process data"); *compare* Jury Instructions, *supra* n.7, at 32 ("loss" is "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service," 18 U.S.C. § 1030(e)(11), and "includes any natural and foreseeable result of any damage that . . . occurred") *with* Webster's, *supra*, at 1338 ("loss" is "an amount that is lost"). The parties agreed that "individuals" include "both natural persons and governmental agencies." Jury Instructions, *supra* n.6, at 32. Although that definition is broader than the dictionary definition of "person," *see* Webster's, *supra*, at 1686 ("person" is "an individual human being"), both "individual" and "person" are often defined more broadly in statutes. *See Clinton v. City of New York*, 524 U.S. 417, 428 & n.13 (1998) (in Line Item Veto Act, 2 U.S.C. § 692(a)(1) (1994), "individual" "is synonymous with the word 'person'" and "'person' often has a broader meaning in the law" (citing 1 U.S.C. § 1 ("person" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"))).

For the foregoing reasons, the judgment of the district court is affirmed.[11]

*So ordered.*

---

[11]To the extent Perry raised additional claims in his pro se brief, we find them all without merit.