IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-1521-11







MATTHEW JOHN CASANOVA, Appellant


 v.


THE STATE OF TEXAS






ON STATE'S PETITION FOR DISCRETIONARY REVIEW

FROM THE EIGHTH COURT OF APPEALS

ORANGE COUNTY




 Price, J., delivered the opinion of the Court in which Keller, P.J., and
Meyers, Keasler, Hervey, Cochran and Alcala, JJ., joined. Womack, J.,
concurred in the result. Johnson, J., dissented.


O P I N I O N


 The appellant was convicted pursuant to an indictment charging him with the offense
of possession of cocaine in an amount less than one gram, a state-jail felony, and the jury
assessed his punishment at one year's confinement. (1) On appeal, he argued that the trial court
erred in failing to submit a jury instruction under Article 38.14 of the Texas Code of Criminal
Procedure, which requires the jury to find that the testimony of the accomplice witness was
corroborated before it could rely on that testimony for a conviction. (2) Although the appellant
did not object in the trial court to the absence of such an instruction, he argued on appeal that
his conviction should nevertheless be overturned because, under Almanza v. State, (3) he
suffered egregious harm from the defective jury charge that lacked an accomplice witness
instruction. (4) The appellant also argued, alternatively, that he should be acquitted because the
evidence was legally insufficient to corroborate the testimony of the accomplice witness.

 In an unpublished opinion, the Eighth Court of Appeals reversed the appellant's
conviction. (5) The court of appeals agreed with the appellant that the lack of an accomplice-witness instruction egregiously harmed him. (6) Additionally, the court of appeals sua sponte
noted that the trial court had neglected to read the jury charge out loud to the jury as required
by Articles 36.14 and 36.16 of the Code of Criminal Procedure. (7) Although the appellant
neither objected to this second deficiency at trial, nor even raised it as a point of error on
appeal, the court of appeals recognized it as jury-charge error that is also subject to Almanza
analysis and found it also to be egregiously harmful. (8)

 The court of appeals failed to reach the appellant's legal sufficiency claim--even
though, if successful, such a claim would result in his acquittal. (9) We granted the State's
petition for discretionary review in order to examine the court of appeals's finding of
egregious harm with respect to the two jury charge errors. We now reverse the judgment of
the court of appeals.

I. ACCOMPLICE-WITNESS INSTRUCTION

A. The Legal Standard

 The appellant's wife, Esther Garza, was the State's principal witness against him at
his trial. By the time she testified against him, she herself had been indicted--indeed, she
had pled guilty, been convicted, and was awaiting a probated sentence--for possession of
the identical cocaine that the appellant was on trial for possessing. She was therefore an
accomplice as a matter of law, and it was error for the trial court to fail to submit an
accomplice-witness instruction to the jury. (10) The only question is one of harm. Because the
appellant did not object to the error at trial, reversal follows only in the event that the record
demonstrates that the error resulted in egregious harm. (11)

 In Saunders v. State, (12) we articulated a standard for determining egregious harm under
Almanza in the context of the failure to submit an accomplice-witness instruction:

 [I]f the omission is not made known to the trial judge in time to correct his
error, appellate review must inquire whether the jurors would have found the
corroborating evidence so unconvincing in fact as to render the State's overall
case for conviction clearly and significantly less persuasive. (13)


We reiterated this standard for egregious harm in Herron v. State. (14) In the instant case, the
court of appeals cited to both Saunders and Herron in its opinion, but only in support of
incidental propositions of law. Nevertheless, the court of appeals ultimately concluded that
the error was egregiously harmful, at least in part, because "rational jurors would have found
the State's case for conviction clearly and significantly less persuasive had they been
properly instructed[.]" (15) Thus, the court of appeals invoked the Saunders/Herron standard.

 In reaching its conclusion under the appropriate standard, the court of appeals
nevertheless alluded to several cases that involve the discrete issue of the sufficiency of non-accomplice testimony to corroborate. (16) In the sufficiency context, we have said that, "when
there are two permissible views of the evidence (one tending to connect the defendant to the
offense and the other not tending to connect the defendant to the offense), appellate courts
should defer to that view of the evidence chosen by the fact-finder." (17) Seizing upon this
language, the State now argues that the court of appeals erred in finding egregious harm in
this cause without deferring to the view of the fact-finder, in light of evidence in the record
that the State contends could permissibly be viewed both as tending to connect the appellant
to possession of the cocaine and not tending to connect him to it. We disagree. Because no
accomplice-witness instruction was submitted to the jury in this cause, there is no fact-finder's view to which an appellate court can defer for purposes of assessing egregious harm,
vel non. That non-accomplice evidence may be, at a bare minimum, sufficient to support a
finding that the accomplice witness's testimony was corroborated, when viewed in the light
most favorable to the jury's verdict, does not dispose of the question of egregious harm. (18) 
Instead, the reviewing court must take the entire record into account, as in any Almanza
analysis, (19) to assess whether the jury, had it been properly instructed on the law requiring
corroboration of accomplice-witness testimony, "would have found the corroborating
evidence so unconvincing in fact as to render the State's overall case for conviction clearly
and significantly less persuasive." (20) We begin with a synopsis of the evidence relevant to the
appellant's guilt independent of the accomplice witness's testimony.

B. The Non-Accomplice Evidence

 The jury was authorized to find the appellant guilty either as a principal actor or as a
party to possession of the cocaine, which was found in Garza's purse. To find the appellant
guilty as a party, the jury would have to be able to find that, "acting with intent to promote
or assist" Garza's possession of the cocaine found in her purse, he "solicit[ed], encourag[ed],
direct[ed], aid[ed], or attempt[ed] to aid" Garza in that possession. (21) Before the jury could
rationally convict the appellant either as a principal or as a party, it would have had to be able
to find, at a bare minimum, that he was aware that Garza possessed the cocaine in her purse. 
After all, he can neither personally possess, nor facilitate the possession by another, of drugs
that he does not know to exist. We look to the non-accomplice evidence, therefore, with an
eye to determining whether it tends to establish that the appellant was aware that there were
drugs in Garza's purse. Discounting Garza's own accomplice testimony that directly
established the appellant's complicity, the remaining evidence unfolded as follows.

 Chris Hartman was a patrol officer with the Vidor Police Department on the evening
of January 3, 2007, when he was called to the La Quinta Inn at about 9 p.m. on an indecent
exposure complaint. Contacting the desk clerk about the call, Hartman was directed to a
Hispanic male, the appellant, leaning against a pillar and smoking a cigarette right outside
the front door. Hartman formed an immediate impression that the appellant was "on some
kind of drug or alcohol." The appellant's pupils "were really constricted[,]" and he was
"paranoid[,]" claiming that "someone was trying to kill him." When Hartman asked the
appellant whether he had "been taking any drugs or any kind of medication[,]" the appellant
replied that "he'd been smoking crack and smoking pot." Concerned that the appellant might
constitute a danger to himself or to the public, Hartman asked whether there was a
responsible adult into whose custody he could commit the appellant as an alternative to
arresting him for public intoxication. (22) The appellant told Hartman that his wife was in their
room upstairs and escorted Hartman there.

 The appellant knocked on the door, and when Garza opened it, the appellant invited
Hartman inside and introduced Garza as his wife. Garza immediately went over to the bed
and sat down with her back against a pillow. Hartman asked the appellant for identification,
and the appellant informed him that his ID was in Garza's purse. When Hartman asked
Garza to confirm that she had the appellant's ID in her purse, she denied that she even had
a purse. At this point, the appellant "started telling on her[,] saying, 'No, she does have a
purse. It's hiding behind her back underneath the pillow.'" Alarmed by this turn of events
and concerned for his safety, Hartman asked Garza to stand up and inquired whether she had
a purse under the pillow. Garza admitted that she did. Hartman searched the purse and
found both marijuana and rock cocaine, but he did not find either the appellant's or Garza's
ID. The appellant was subsequently able to locate Garza's ID "[k]ind of up against the wall
against the television set." Hartman then conducted a warrants check and discovered that the
appellant had an outstanding arrest warrant arising from a burglary charge in another county. 
He arrested both Garza and the appellant--Garza, for possession of the illicit drugs found
in her purse, and the appellant, based on the outstanding warrant. Once the appellant was
handcuffed, he told Hartman that Garza had stolen the Ford Focus that they were driving
from a dealership, "that she had test drove it and never returned it."

 When backup officers arrived, the officers took the appellant and Garza downstairs
and placed them in Hartman's squad car and then set out to verify the appellant's claim that
the Focus had been stolen and to inventory its contents. The appellant became increasingly
paranoid and agitated, continuing to claim that "they're going to kill me, they're going to kill
me." He and Garza were eventually separated, and Hartman had to pepper spray the
appellant before he would calm down. On the way to the Orange County Jail, the appellant
vomited several times in the back of Hartman's squad car and had to be diverted to the
hospital emergency room for precautionary treatment. By this time, Hartman maintained, the
appellant "was out of his mind paranoid."

 On cross-examination, Hartman admitted that he had encountered "people who might
be experiencing some kind of mental episode in their life" that could trigger paranoia. He
conceded that he had failed to detect the distinctive odors of burning marijuana or crack
cocaine when he entered Room 213. Nor did he discover a crack pipe in the room. He also
acknowledged that "it was only after [the appellant's] insistence that [Garza] was sitting on
it that [Hartman] ended up getting into that purse." He did not originally arrest the appellant
for possession of the drugs in Garza's purse, but only added that charge later.

 Garza testified after Hartman, (23) and then the State rested its case-in-chief. The
defense called the appellant as its only witness. The appellant testified that he and Garza had
been "fighting" when they checked into their room at the La Quinta. Garza went into the
bathroom, apparently to take a shower, and the appellant waited on the bed in his boxer
shorts to shower after her. The appellant had been feeling paranoid and fearing for his life,
and Garza was fueling his fear. When Garza emerged from the bathroom, she had tears in
her eyes, and she told the appellant, "This is going to hurt me more than it's going to hurt
you." A scuffle of some sort ensued during which the appellant apparently flashed before
the window in a state of undress. He managed to put his clothes on and fled the room. He
crossed the street to a fast-food restaurant where he called 9-1-1 to summon the police,
telling the 9-1-1dispatcher that he "feared for [his] life." 

 The appellant admitted that, when Hartman approached the appellant outside the La
Quinta lobby, he told Hartman that he had been drinking all day, just as he drinks every day. 
But he denied that he had smoked any crack cocaine that day, and he emphatically denied
telling Hartman that he had smoked either crack or marijuana. He suggested, if somewhat
obliquely, that he had observed Garza smoking marijuana and what he thought was "ice" at
some point earlier in the day and that she might have been smoking cocaine in the bathroom
of their hotel room. But he denied ever having handled the drugs himself. (24) He explained
that he had been "diagnosed with traumatic depression, post traumatic stress, bi-polar two,"
and some other disorder he had never heard of, and that he had been prescribed six
medications to treat these various disorders, including "Celexa" and "Depakot." (25) But, the
appellant maintained, because he knew it is dangerous to take these medications with alcohol,
he had quit taking them, and this was what had caused the paranoia and constricted pupils
that Hartman observed that evening. (26) The appellant claimed to have told Hartman, in
response to Hartman's question whether he had been taking drugs or medication that day, "I
do take drugs, my pills." Asked on cross-examination whether Hartman had simply "made
up" his assertion that the appellant admitted smoking crack and marijuana, the appellant
explained:

 I'm not saying he made it up, I'm assuming that when he found the drugs [in
Garza's purse] he put that - he didn't know about my medical condition so he
automatically being a professional he assumed that the drugs were in my
possession so he figured that we had probably been smoking.


Up in the room, when Hartman asked to see the appellant's ID, the appellant could not find
it in his wallet, so he decided that Garza "had to have it" in her purse. He insisted that, had
he known that there was marijuana and crack cocaine in Garza's purse, he would never have
prompted Hartman to look for it under the pillow. When the prosecutor asked the appellant
whether his escalating paranoia in the police car and en route to the jail was a product of his
"self-medicating with alcohol and crack cocaine and whatever else[,]" he replied, "Alcohol
it's true, but not crack cocaine."

C. Tends to Connect?

 The court of appeals, although it did not directly resolve the appellant's legal
sufficiency claim, nevertheless observed in the course of its egregious harm analysis that the
non-accomplice evidence "was extremely weak and failed to tend to connect [the a]ppellant
to the offense of possession of cocaine[.]" (27) Of course, if it is indeed accurate to say that the
corroborating evidence was so weak that it did not even tend to connect the appellant to the
cocaine in Garza's purse, then it would ineluctably follow that a rational jury would "have
found the corroborating evidence so unconvincing in fact as to render the State's overall case
for conviction clearly and significantly less persuasive." (28) But it would also necessarily mean
that the appellant's legal sufficiency claim should have been sustained and that the court of
appeals should have ordered the entry of a judgment of acquittal. (29) We decline to take that
action today, however, because we disagree with the court of appeals's conclusion that the
evidence altogether failed to tend to connect the appellant to the cocaine.

 We believe that the court of appeals was mistaken to characterize the non-accomplice
evidence, as summarized above, as having no tendency to connect the appellant to possession
of the cocaine found in Garza's purse. We have long held that corroborative evidence need
not be legally sufficient in itself to establish a defendant's guilt. (30) Here, the corroborative
evidence shows that the cocaine was found in the hotel room that the appellant was sharing
with his wife, Garza. The appellant appeared to Hartman to be under the influence of "some
kind of drug or alcohol[,]" and, if Hartman's account is to be believed, the appellant admitted
to having smoked crack cocaine earlier that day. The appellant's paranoia appeared to be
escalating over the course of the evening, suggesting that he may have "been smoking crack"
at a point in time relatively close to Hartman's first encounter with him. The appellant
himself conceded that he was aware that Garza was ingesting drugs earlier in the day and
may have been smoking crack cocaine in the bathroom of the hotel. While this evidence may
not suffice, by itself, to convict the appellant for possession of the cocaine found in Garza's
purse, surely it at least tends to connect the appellant--as a party to Garza's possession, if
not as a principal actor.

 This is not to say, of course, that there is no evidence in the record that also tends to
refute the inference that the appellant was aware of the cocaine in Garza's purse--as we shall
examine below in our egregious harm analysis under Almanza/Saunders/Herron. But that
does not translate into a conclusion that there was no evidence that a rational trier of fact
could conclude tended to connect the appellant to the offense for purposes of Article 38.14's
corroboration requirement. Because the appellant does not argue in his petition for
discretionary review that the court of appeals erred in failing to reach his legal sufficiency
claim and enter a judgment acquitting him, and because we conclude in any event that the
evidence was legally sufficient to tend to connect the appellant to the offense, we have no
occasion to remand the cause to the court of appeals for a legal sufficiency analysis.

 As we have already noted, however, that does not necessarily dispose of the egregious
harm issue. The corroborating evidence, though legally sufficient, may yet prove in a given
case to be so insubstantial or "unconvincing" as to render the lack of an accomplice-witness
corroboration instruction egregiously harmful. (31) We turn to that inquiry next.

D. So Unconvincing as to Render the State's Case

Significantly Less Persuasive?


 Whether error in failing to submit an accomplice-witness instruction will be deemed
harmful is, we have said, a function of the strength of the corroborating evidence. (32) The
strength of that evidence is, in turn, a function of (1) its reliability or believability and (2)
how compellingly it tends to connect the accused to the charged offense. (33) Corroborating
evidence that is exceedingly weak--that is to say, evidence that, while it is legally sufficient
to tend to connect, is nevertheless inherently unreliable, unbelievable, or dependent upon
inferences from evidentiary fact to ultimate fact that a jury might readily reject--may call for
a conclusion that the failure to give the accomplice-witness instruction resulted in harm
regardless of whether the deficiency was objected to. (34) Corroborating evidence this weak
may thus result in both egregious harm and some harm. (35) As the strength of the
corroborating evidence increases, however, a reviewing court may no longer be able to
declare that the lack of an accomplice-witness instruction resulted in egregious harm, but it
may still conclude that the deficiency resulted in some harm and reverse the conviction if
there was a trial objection. (36) And as the corroborating evidence gains in strength to the point
that it becomes implausible that a jury would fail to find that it tends to connect the accused
to the commission of the charged offense, then a reviewing court may safely conclude that
the only resultant harm is purely theoretical and that there is no occasion to reverse the
conviction, even in the face of an objection, since the jury would almost certainly have found
that the accomplice witness's testimony was corroborated had it been properly instructed that
it must do so in order to convict. (37)

 As we have explained, the evidence tending to connect the appellant to the drugs in
Garza's purse was far from insubstantial. Hartman's testimony was not inherently incredible,
and it tended to show that the appellant would have at least been aware that Garza had
cocaine in her possession in their shared hotel room. But it also did not go wholly
unchallenged. The appellant denied telling Hartman that he had smoked marijuana and crack
cocaine earlier in the day. And it was clearly against the appellant's self-interest to have
insisted to Hartman that Garza was hiding her purse behind the pillow if he actually knew
that she had cocaine concealed in it. These facts might have caused the jury to question the
credibility of the non-accomplice evidence--enough, perhaps, to establish that the appellant
suffered at least some harm from the absence of an accomplice-witness instruction. Even so,
however, we do not think that this likelihood is great enough to say that egregious harm is
evident on the record.

 This case is quite unlike Saunders, in which we found egregious harm. In Saunders,
we observed that the inculpatory inferences deriving from the State's corroborative evidence
were tenuous to begin with. Moreover, Saunders presented plausible defensive evidence that
cast all of the State's corroborating evidence in a light that convincingly undermined every
inculpating inference. Here, by contrast, the inferences to be drawn from the State's
corroborating evidence more than sufficiently tend to connect the appellant to Garza's
possession of the cocaine, and in order for the jury to have discounted that tendency, it would
have had to accept the appellant's less-than-creditable explanations. For example, the
appellant's surmise that Hartman simply mistook his statement that he takes "pills" for his
various mental disorders for an assertion that he had been smoking marijuana and cocaine
earlier in the day defies plausibility. The jury would have had to conclude that Hartman was
simply lying about the content of the appellant's statement; yet the record presents no
compelling reason for them to believe that he was. We think the likelihood that the jury
would have accepted the appellant's exculpatory evidence is too remote to justify a
conclusion that the corroborating evidence presented by the State was "so unconvincing in
fact as to render the State's overall case for conviction clearly and significantly less
persuasive." Accordingly, we conclude that the court of appeals erred to hold that the
appellant suffered egregious harm from the absence of an accomplice-witness instruction.

III. READING THE COURT'S CHARGE ALOUD

 The court of appeals concluded that egregious harm also occurred when the trial court
failed to read the guilt-phase jury charge aloud before sending the jury back to deliberate, as
required by Articles 36.14 and 36.16 of the Code of Criminal Procedure. (38) There is no
question that, in instructing the jury to retire to the jury room, elect a presiding juror, and then
have that presiding juror for the first time "read the charge out loud in the jury room[,]" the
trial court violated the requirements of the statutory scheme. (39) The only question is whether
the court of appeals was correct to conclude, sua sponte, that this error caused the appellant
egregious harm as contemplated by Article 36.19 of the Code of Criminal Procedure. (40)

 The court of appeals acknowledged that, sans a trial objection, "[a] judge's failure to
read a jury charge will not be reversed absent a finding that the defendant was deprived of
a fair and impartial trial." (41) Among the cases the court of appeals cited for this proposition
was this Court's 1957 opinion on rehearing in Quinn v. State. (42) Quinn is a case very close
on point in which we found there to be no harm. There, the trial court "instructed the jury
that 'here was the charge of the court and that they could read the same when they retired for
their deliberations' but . . . he 'failed and refused' to read it to them." (43) Nor did Quinn's trial
counsel "at any time request[ ] that it be read." (44) Pointing to then-Article 666 of the 1925
Code of Criminal Procedure, which was the direct predecessor to, and is in all things
materially identical to, current Article 36.19, this Court observed that "a disregard of the
statute [requiring the trial court to read the jury charge aloud] plus injury must be shown in
order to bring about a reversal of the conviction." (45) We reasoned that, "[c]learly, the
appellant could have shown injury by proving at the hearing on his motion for new trial, for
example, that the jury did not in fact read the charge after they had retired." (46)

 But for two intervening legal developments, we would regard Quinn as clearly
controlling the question of egregious harm in this case. First, we have clarified in recent
years that neither an appellant nor the State has a burden of proof or persuasion when it
comes to an analysis for harm under Article 36.19, as construed by Almanza. (47) To the extent
that our analysis in Quinn might suggest that it was the appellant's burden to prove injury,
therefore, it is no longer controlling. Second, and more critically, since our opinion in Quinn,
the consolidated Texas Rules of Evidence have gone into effect, including Rule 606(b),
which restricts the admissibility of evidence from jurors themselves, during any post-verdict
proceedings, that impugns the validity of their verdict. (48) Thus, it is less certain today that the
appellate record can be made "clear" whether the jury actually followed the trial court's
instructions to have the presiding juror read the jury charge aloud in the jury room. (49)

 The court of appeals regarded the error as egregiously harmful because, "[b]ased upon
the record before us, we cannot find that the jury was ever properly instructed regarding the
proper application of the applicable law to the facts of the case regarding" the appellant. (50) 
Absent such an instruction spread on the record, the court of appeals reasoned, it was unable
to conclude that the appellant enjoyed a fair and impartial trial. (51) Picking up on and
extrapolating from the court of appeals's reasoning, the appellant now urges us to hold that
the trial court's failure to read the charge aloud constitutes a kind of structural error which,
because Rule 606(b) renders him incapable of demonstrating harm, must be deemed
automatically, and a fortiori, egregiously harmful. (52)

 Given the plain statutory language of Article 36.19, however, we are not at liberty to
adopt this approach. The applicable portion of Article 36.19, as construed by Almanza,
mandates that, in the absence of a trial objection, "the judgment shall not be reversed . . .
unless it appears from the record that the defendant has not had a fair and impartial trial." (53) 
The court of appeals believed that the record failed to demonstrate that the purposes of
Article 36.16's requirement that the judge read the charge aloud were served in this case,
those purposes being "to enable counsel to object to the instructions and ensure that each
member of the jury actually receives the instructions in an unbiased and clear manner." (54) But
the record in no way indicates that these purposes were not served. The appellant has
identified no specific objection to the written jury charge that he now claims he would have
leveled had the instructions been read aloud in open court. (55) And while the reporter's record
clearly reveals that the trial court erred by not reading the charge out loud in open court, it
just as clearly reveals that the trial court instructed the jury to read the charge aloud in the
jury room. It does not appear from the record that the jury ignored this explicit instruction. 
Nor does the record provide any reason to believe that the juror selected to read the charge
aloud in the jury room failed to do so "in an unbiased or clear manner." If the present record
triggers any particular presumption, therefore, it should be the usual presumption that jurors
follow the trial court's explicit instructions to the letter. (56) And, presuming that the
appellant's jury did so, we have no occasion to conclude, as the court of appeals did, that the
jury did not receive proper instructions with respect to the law applicable to the appellant's
case. To whatever extent that Rule 606(b) might restrict the appellant's ability to overcome
this quotidian appellate presumption, (57) that does not justify appellate abrogation of the plain
dictates of Article 36.19. It is just another one of the unavoidable systemic costs imposed
by the policy of jury insulation that Rule 606(b) favors. (58) We hold that the court of appeals
erred to conclude that the record shows that the appellant suffered egregious harm from the
trial court's failure to read the jury charge aloud.

CONCLUSION

 Accordingly, we reverse the judgment of the court of appeals and remand the cause
to that court to address the appellant's remaining claim of trial error. (59)


DELIVERED: November 21, 2012

PUBLISH
1. Tex. Health & Safety Code § 481.115(a) & (b); Tex. Penal Code § 12.35(a).
2. See Tex. Code Crim. Proc. art. 38.14 ("A conviction cannot be had upon the testimony of
an accomplice unless corroborated by other evidence tending to connect the defendant with the offense
committed; and the corroboration is not sufficient if it merely shows the commission of the offense.").
3. 686 S.W.2d 157 (Tex. Crim. App. 1985) (opinion on reh'g).
4. Saunders v. State, 817 S.W.2d 688 (Tex. Crim. App. 1991).
5. Casanova v. State, No. 08-10-00006-CR, 2011 WL 3849453 (Tex. App.--El Paso, delivered
Aug. 31, 2011) (not designated for publication).
6. Id. at *5.
7. 

 Id. See Tex. Code Crim. Proc. arts. 36.14 & 36.16.
8. Id. at *7 (finding "that the trial court's errors singularly and cumulatively resulted in egregious
harm to" the appellant).
9. See Ex parte Reynolds, 588 S.W.2d 900, 902 (Tex. Crim. App.1979) (lack of evidence to
corroborate accomplice testimony results in an acquittal, with federal double jeopardy consequences). 
Cf. Tex. Code Crim. Proc. art. 38.17 (when corroboration of a witness is "required to authorize a
conviction, if the requirement be not fulfilled, the court shall instruct the jury to render a verdict of
acquittal, and they are bound by the instruction").
10. "When the evidence clearly shows (i.e., there is no doubt) that a witness is an accomplice as
a matter of law, the trial judge must instruct the jury accordingly. * * * A witness who is indicted for
the same offense or a lesser-included offense as the accused is an accomplice as a matter of law." 
Smith v. State, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011).
11. Almanza, supra, at 171. It is to be remembered that "burdens of proof or persuasion have no
place in a harm analysis conducted under Almanza." Warner v. State, 245 S.W.3d 458, 464 (Tex.
Crim. App. 2008).
12. 817 S.W.2d 688 (Tex. Crim. App. 1991).
13. Id. at 692.
14. 86 S.W.3d 621, 632 (Tex. Crim. App. 2002).
15. Casanova, supra, at *5.
16. Prominent in the court of appeals discussion of the egregious harm issue are citations to our
opinions in Smith v. State, supra, at 442-48, and Simmons v. State, 282 S.W.3d 504 (Tex. Crim. App.
2009). Casanova, supra, at *3, *5. Each of these cases addresses the issue of whether non-accomplice
evidence was sufficient to "tend to connect" the defendant to the offense for purposes of Article 38.14. 
Neither case involved the question of whether failure to give an Article 38.14 instruction in the first
instance, when no objection was made, was egregiously harmful.
17. Simmons, supra, at 508.
18. Cf. Scott v. State, 227 S.W.3d 670, 694 (Tex. Crim. App. 2007) ("[A] constitutional harm
analysis does not turn on whether, discounting the erroneously admitted evidence, the remaining
evidence was legally sufficient to convict."); Satterwhite v. Texas, 486 U.S. 249, 258-59 (1988) ("The
question . . . is not whether the legally admitted evidence was sufficient to support the death sentence,
which we assume it was, but rather, whether the State has proved beyond a reasonable doubt that the
error complained of did not contribute to the verdict obtained." (internal quotation marks omitted)).
19. 686 S.W.2d at 171 ("[T]he actual degree of harm must be assayed in light of the entire jury
charge, the state of the evidence, including the contested issues and weight of probative evidence, the
argument of counsel and any other relevant information revealed by the record of the trial as a
whole."). 
20. Saunders, supra, at 692; Herron, supra, at 632.
21. Tex. Penal Code § 7.02(a)(2). The jury was authorized to find the appellant guilty if, "acting
alone or as a party as that term has been previously defined" in the jury charge, he possessed the
cocaine. The definition previously given listed every act included in Section 7.02(a)(2) capable of 
triggering party liability, namely, soliciting, encouraging, directing, aiding, or attempting to aid the
commission of the offense. The jury was not authorized to find the appellant guilty as a party under
Section 7.02(b)'s conspiracy theory of party liability. Tex. Penal Code § 7.02(b). 
22. See Tex. Penal Code § 49.02(a) & (c) ("A person commits [a Class C misdemeanor] offense
if the person appears in a public place while intoxicated to the degree that the person may endanger
the person or another.").
23. The court of appeals accurately summarized Garza's testimony:


 Accomplice-witness Garza's testimony established that she and Appellant had
purchased cocaine earlier in the day after cashing her paycheck, that they had smoked
cocaine during the day and in the hotel room using Appellant's cocaine pipe, and that
Appellant was aware that cocaine was in the hotel room on the dresser. When
Officer Hartman requested that Garza open the door, Garza stated that she stuffed the
crack cocaine in her purse and hid it behind her back because she knew she had "the
stuff" in her purse when Appellant asked her for his identification, and that is why
she told Appellant in the officer's presence that Appellant had taken his wallet with
him. Although admitting that she was guessing, Garza stated that Appellant knew
that she puts everything in her purse, that her purse had been on the desk, and that
neither her purse nor the crack were on the dresser any longer. She testified that
Appellant did not see her put the crack inside her purse because he wasn't in the
room at the time.


Casanova, supra, at *4.
24. Speaking of the day of the appellant's arrest, defense counsel inquired:


 Q Had you seen [Garza] - you've seen her do some weed, did you do any
weed that day?


 A No, I don't smoke no weed.


 Q Did you observe her doing any crack?


 A To tell you the truth, honestly, I thought she was smoking ice not crack.


 Q Did you smoke any of it?


 A No.


 Q Did you ever handle the drugs?


 A No. I didn't never even knew that - I mean, I couldn't even tell you - I
didn't even know it was packaged. To my surprise I didn't know she admitted to
putting it in a plastic wrapper. You see I didn't - all of that was new to me because I
had no idea.


 Q So you get to the hotel room, and did she ever smoke any weed in the room?


 A No, sir.


 Q Did she ever smoke any crack in the room?


 A She was in the restroom. She was in the restroom and I thought she was
going to take a shower but she never came out like any sign of a shower.
25. The defense offered no further evidence to describe the symptoms of these various disorders
or the effects of the medications prescribed to treat them.
26. The prosecutor asked:


 Q [Y]ou'd been smoking crack all day and you were high on crack; isn't that
right?


 A I don't remember smoking crack.


 Q But the reason why you were paranoid and not making sense and your eyes
were glassy and your pupils were constricted is because you'd been smoking crack all
day; isn't that true.


 A No, because I didn't have my medication.
27. Casanova, supra, at *5.
28. Saunders, supra, at 692. Had the State simply presented Garza's testimony, and nothing more,
the lack of an accomplice-witness-as-a-matter-of-law instruction would clearly have caused the
appellant egregious harm, since a properly instructed jury would have had no competent evidence
before it upon which to convict. If the evidence other than Garza's testimony truly had no tendency
to connect the appellant to the offense, the result would necessarily be the same--egregious harm.
29. See note 9, ante.
30. E.g., Brown v. State, 561 S.W.2d 484, 487 (Tex. Crim. App. 1978).
31. Saunders, supra, at 692.
32. See Herron, supra, at 632 ("The difference in harm standards impacts how strong the non-accomplice evidence must be for the error in omitting an accomplice witness instruction to be
considered harmless.").
33. See Id. ("In determining the strength of a particular item of non-accomplice evidence, we
examine (1) its reliability or believability and (2) the strength of its tendency to connect the defendant
to the crime.").
34. See Saunders, supra, at 693 (when inferences to be drawn from State's corroborating evidence
were not particularly "well supported by [that] evidence" and, moreover, were contradicted by
defensive evidence that contradicted those inferences, "rational jurors would certainly have found the
State's case significantly less persuasive had they been told that [the accomplice witness's] testimony
could not be accepted without corroboration").
35. A record that demonstrates that jury charge error resulted in egregious harm will, a fortiori,
also demonstrate that the error resulted in at least some harm.
36. See Herron, supra, at 633 (discussing Burns v. State, 703 S.W.2d 649 (Tex. Crim. App. 1985),
in which some harm was found because the only corroborating evidence consisted of the defendant's
confession, but the jury could have found the confession involuntary and was instructed to disregard
it in that event, in which case there would have been no corroborating evidence).
37. See id. (discussing Medina v. State, 7 S.W.3d 633 (Tex. Crim. App. 1999), in which the Court
found only theoretical harm, not some harm, because "there was a substantial amount of non-accomplice evidence" and there was "no rational and articulable basis for disregarding the non-accomplice evidence or finding that it fails to connect the defendant to the offense").
38. See Tex. Code Crim. Proc. art. 36.14 (trial court "shall . . . deliver to the jury" a charge
"distinctly setting forth the law applicable to the case;" and "[b]efore said charge is read to the jury,"
trial court must give the parties an opportunity to present any objections thereto) (emphasis added); 
Tex. Code Crim. Proc. art. 36.16 (after objections to the charge are made by the parties, "the judge
shall read his charge to the jury as finally written").
39. The trial court instructed the jury:


 I'm going to give you two oral instructions. I could read you this whole
charge out loud. I've found that's not real productive to just [sit] there and have me
read all these pages. So what I'm going to instruct you [is] this: When you go back
to begin your deliberations the first thing you need to do is elect a presiding juror. 
The second thing you need to do is the presiding juror, or a volunteer, will need to
read the charge out loud in the jury room. You may think, "Well, what's the
difference, you read [it] out loud or we read it out loud." Well, back there you're
going to be a lot more comfortable telling the reader, "Hey, slow down. Your
mouth's moving faster than my ears are." Or [if] somebody coughs or moves a chair,
you can say, "Hey, will you stop and start that paragraph over so I don't lose that
part." It's just a lot more comfortable environment. Elect a presiding juror, the
presiding juror or a volunteer reads the entire charge out loud and then and only then
will you begin your deliberations. 
40. See Tex. Code Crim. Proc. art. 36.19 ("Whenever it appears by the record in any criminal
action upon appeal that any requirement of Articles 36.14 . . . [and] 36.16 . . . has been disregarded,
the judgment shall not be reversed unless the error appearing from the record was calculated to injure
the rights of defendant, or unless it appears from the record that the defendant has not had a fair and
impartial trial."). The court of appeals did not err to analyze this issue under Article 36.19, as
construed by Almanza. Moreover, the court of appeals was free to address the issue as one of
unassigned fundamental error. Sanchez v. State, 209 S.W.3d 117, 121 (Tex. Crim. App. 2006). "Of
course, absent a trial objection, the court of appeals was not free to reverse the conviction on the basis
of jury-charge error absent a finding of the requisite egregious harm." Id.
41. Casanova, supra, at *5.
42. 297 S.W.2d 157 (1957) (opinion on reh'g).
43. Id. at 159.
44. Id.
45. Id.
46. Id.
47. Warner, supra, at 464.
48. See Tex. R. Evid. 606(b) ("Upon an inquiry into the validity of a verdict or indictment, a juror
may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect
of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to
or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror
concerning any matter about which the juror would be precluded from testifying be admitted in
evidence for any of these purposes.").
49. See People v. Marquez, 963 F.2d 1311, 1315-16 (9th Cir. 1992) (failure of trial court to read
critical portions of jury charge aloud defied harm analysis because the defendant "was precluded by
[Federal Rule 606(b)] protecting a jury's decisional process from interviewing the jurors to show that
one or more of them failed to read the written instructions[,]" and this circumstance rendered the
failure to read the instructions aloud a "structural defect," compelling an automatic reversal).
50. Casanova, supra, at *6.
51. Id.
52. The appellant cites a number of cases from other jurisdictions in support of his argument that
trial court error in failing to read the jury charge aloud should be immune from a harm analysis. None
is as close on point as this Court's opinion in Quinn, and none involves a statutory analog to our
Article 36.19. See United States v. Noble, 155 F.2d 315, 316 (3rd Cir. 1946) (trial court erred in failing
to instruct the jury orally or in writing "as to the nature and elements" of the offenses he allegedly
committed, and the error was not rendered harmless by permitting the jurors to take the charging
instrument with them into the jury room); State v. Norris, 699 P.2d 585, 589 (Kan. Ct. App. 1985)
(reversible error occurred when "the court did not read the instructions to the jury and did not even
instruct the foreman of the jury to do so"); People v. Marquez, supra, at 1312 (reversible error where
trial court failed, over objection, "to instruct the jury orally [which] makes it impossible for an
appellate court to determine from the record whether each juror was aware of the elements of each
crime before the verdict was rendered"); State v. Lamb, 541 N.W.2d 457, 458-59 (N.D. 1996) (trial
court committed reversible error when it refused, over objection, to read jury instructions aloud but
instead instructed the jury foreman to read them aloud during deliberations); United States v. Perry,
479 F.3d 885, 893-94 (D.C. Cir. 2007) (trial court's failure to read portions of jury instructions out
loud did not, in the absence of any objection, constitute plain error calling for reversal on appeal).
53. Tex. Code Crim. Proc. art. 36.19.
54. Casanova, supra, at *5.
55. It is at least questionable whether it is accurate to say, in Texas, that permitting objections to
be made to the content of the jury charge constitutes one of the purposes of requiring the trial court to
read it aloud. The court of appeals cited a federal case for this proposition. Id. (citing United States
v. Noble, supra, at 318 ("counsel and the defendant [are] entitled to hear the instructions in order that
they may, if they are incorrect, object to them and secure their prompt correction by the trial judge")). 
In Texas, however, Articles 36.14 through 36.16 of the Code of Criminal Procedure embrace a fairly
comprehensive scheme for reviewing the trial court's charge in advance and making any objections
or requests during the jury-charge conference, "and thereupon the judge shall read his charge to the
jury as finally written[.]" Tex. Code Crim. Proc. arts. 36.14, 36.15 & 36.16. In any event, the
appellant does not even now claim that, had the jury charge been read aloud, he would have noticed
that it lacked an accomplice-witness instruction and objected on that basis.
56. E.g., Thrift v. State, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005) ("On appeal, we generally
presume the jury follows the trial court's instructions in the manner presented. The presumption is
refutable, but the appellant must rebut the presumption by pointing to evidence that the jury failed to
follow the trial court's instructions.") (footnotes omitted).
57. We need not decide that question in the instant case. Neither the State nor the appellant has
offered affidavits or testimony from any juror to show whether or not the jury actually did read the jury
charge aloud in the jury room, as instructed.
58. See Steven Goode, Olin Guy Wellborn III & M. Michael Sharlot, 1 Texas Practice: Guide
to the Rules of Evidence §606.2, at 673 & 675-76 (3rd ed. 2002) ("The question, which has vexed
courts for years, is how far can the legal system go in opening verdicts to attack . . . before the cure
becomes worse than the disease. * * * The promulgation in 1983 of Civil Rule 606(b) moved Texas
back toward its original view favoring the protection of jurors and the finality of their judgments over
the desire to rectify verdicts arrived at through irregular means. * * * Consistent with traditional
criminal practice, former Criminal Rule 606(b) authorized the admission of juror testimony 'as to any
matter relevant to the validity of the verdict or indictment.' Consolidated Rule 606(b) abruptly ended
this practice. * * * Once notoriously receptive to the practice of allowing jurors to impeach their
verdicts, Texas now evinces a marked antipathy to it on both the civil and criminal sides of the
docket.") (footnotes omitted); McQuarrie v. State, ___ S.W.3d ___, 2012 WL 4796001, at *7-8 (Tex.
Crim. App., delivered Oct. 10, 2012) (discussing "policy considerations that generally support the
common-law rule against the admission of jury testimony to impeach a verdict"); id. at *16 (Cochran,
J., dissenting) (enumerating the "several important public policy interests" that Rule 606(b) serves,
while recognizing that "the rule extracts great costs as well"). See also Ford Motor Co. v. Castillo,
279 S.W.3d 656, 666 (Tex. 2009) ("We have previously articulated some reasons underlying the
prohibition of unfettered probing into jury deliberations: (1) keeping jury deliberations private to
encourage candid discussion of the case, (2) protecting jurors from post-trial harassment or tampering,
(3) preventing a disgruntled juror whose view did not prevail from overturning the verdict, and (4)
protecting the need for finality.").
59. In his first point of error on appeal, the appellant claimed that the trial court erred during the
jury selection process. Because the court of appeals reversed the conviction on the basis of jury-charge
error, it did not reach this issue in its initial opinion.