[Cite as *State v. Turner*, 2026-Ohio-1409.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | Case No. 24CA4066 |
| Plaintiff-Appellee, | : | |
| | : | |
| v. | : | |
| | : | DECISION AND JUDGMENT |
| RICHARD TURNER, | : | ENTRY |
| | : | |
| Defendant-Appellant. | : | **RELEASED: 04/08/2026** |

APPEARANCES:

Valerie M. Webb, Portsmouth, Ohio, for appellant.

Shane A. Tieman, Scioto County Prosecuting Attorney, and Jay S. Willis, Assistant Scioto County Prosecuting Attorney, Portsmouth, Ohio, for appellee.

Wilkin, J.

{¶1} This is an appeal of a Scioto County Court of Common Pleas judgment entry in which Richard Turner ("Turner") was convicted of attempted murder, felonious assault, and breaking and entering. On appeal Turner contends his convictions for attempted murder and felonious assault should be reversed because there is insufficient evidence to support the finding of guilt beyond a reasonable doubt. Further, he maintains that the convictions for attempted murder and felonious assault are against the manifest weight of the evidence. After reviewing the parties' arguments, the record, and the applicable law, we find no merit to the assignments of error and affirm the judgment of the trial court.

BACKGROUND

{¶2} In the late afternoon of August 21, 2023, the homeowner of a rural residence on Big Doney Road in Scioto County received an anonymous call stating that someone was inside his property without permission.  The homeowner called the sheriff's office to report the incident. Deputy Vance of the Scioto County Sheriff's Office arrived and discovered a man and woman sleeping in a bed, with another person walking around the property.  The squatters had damaged the property in an amount exceeding $25,000 per the homeowner's estimate.

{¶3} Vance (who is five-feet-eight-inches tall, approximately 160 pounds) was wearing his full uniform including gear that weighed approximately 30 pounds.  Vance shined a flashlight and announced himself.  Vance instructed the man and woman to get up and come outside.  When the man and woman came out of the bedroom, Vance identified the man as Turner, whom he knew as "Peck."  At the time, Turner was six-feet-three-inches tall and weighed approximately 165 pounds and was wearing only underwear and shoes.  The homeowner was standing by the door and Turner got ahead of the woman just a bit.  Once they got to the door of the residence, the homeowner saw Turner take off at a fast pace and said, "he's running."  Vance advised dispatch he was involved in a foot pursuit while he began running and gave chase.

{¶4} Turner went towards the wood line of the property.  Vance started running through the woods in pursuit and had to jump a fence.  The brush was about chest-high in that area.  Vance lost sight of Turner for a split second, so he

came out of the woods and got behind Turner.  Vance was gaining ground on Turner.  Vance took out his taser and told Turner to stop or he would be tased.

{¶5} At that point, Turner jumped or lunged into a small pond of water and went to his hands and knees.  Then Turner said, "you can't tase me.  I'm in the water."  It is sheriff's department policy not to tase suspects in water, so Vance holstered his taser.  He then advised Turner to get out of the water, but Turner replied that he was stuck.  Vance went into the knee-deep water to pull Turner out.  Turner said, "I'll come out," so Vance reached for Turner's foot but instead pulled on Turner's arm to help him come out.  Rather than coming towards Vance, Turner kept pulling away, which caused them to go farther out in the pond.  Vance then tried to handcuff Turner, but Turner kept resisting.  Even though Vance commanded Turner to "come out of the water," and "stop resisting" numerous times, Turner continued to resist.  During the incident, every time Vance would step in the water, his boot would sink down further.  At some time the handcuffs fell into the water.

{¶6} During this struggle, Vance's radio kept flopping around and the mic had come off the mic loop.  Vance was now struggling on his knees with Turner.  Vance tried to radio that he needed backup but Turner kept smacking the radio out of Vance's hands and would not let Vance call for help.  At some point, Turner grabbed the radio so that Vance could not use it at all.  Vance struck Turner on the head with his right hand, so Vance could get the radio and call for backup.  Vance told Turner to let go of the radio.  Turner said, "[w]hat the fuck

dude? Why'd you hit me?" Vance told Turner to let go of the radio, and Turner did not, so Vance struck Turner a second time, and Turner released the radio.

{¶7} Then the men were side-by-side, on their knees. As the men were hip-to-hip, Turner put his arm up and put Vance in a headlock. This happened three or four times, but Vance kept slipping out of the headlock before it became a chokehold to avoid Turner choking him out. Vance knew from his training that a chokehold restricts someone's airway and makes the person pass out and lose consciousness. When Vance tried to slip out of the headlock the third or fourth time, Turner had a chokehold at an angle, and Vance could not remember if Turner squeezed or put any pressure. The next thing Vance remembers is coming up out of the water and not being able to breathe. Vance's eyesight was very blurry because he had gunk in his eyes and was hacking some stuff up.

{¶8} Vance tried to walk on his feet out of the pond, but it was very difficult. When he got to edge of the water, he didn't see Turner, so he laid down on his stomach and was hacking and throwing stuff up. His left eye was completely blocked, and he could only see maybe twenty percent out of his right eye. He then pulled his service weapon to protect himself.

{¶9} Deputy Wentz was one of the deputies dispatched to the scene to assist. He noticed that Vance was not responding to radio calls. When Wentz got to the area where Vance was, he saw Vance in a prone position at the edge of the water. Deputy Vance was hacking, coughing, and having difficulty breathing. Vance was completely wet, from head-to-toe, and covered in mud.

Vance told Wentz he had just been assaulted. Vance tried to walk behind Wentz, but at some point fell down to the ground, in a kneeling position.

{¶10} Paramedics who were called to scene to assist Vance noticed that he had debris in his hair, nostrils, and ears. Vance was in shock and had an elevated pulse and blood pressure. While in the squad, Vance expelled black sewer mud which had leaves, sticks, and debris in it. Vance also blew his nose several times. Vance had redness to the back of his chest, arms, and neck, consistent with being struck or held under the water. The redness was somewhere across the chest and around to the collarbone and in the throat area. The night of the incident, Vance told caregivers at the hospital that he had engaged a suspect in water, and a fight had ensued during which Vance had been submerged to the point of passing out. Vance said he then made his way to the bank, and EMS was called.

{¶11} Turner continued to run and multiple law enforcement agencies were called to the scene to assist in locating him. Despite law enforcement using an aircraft and a canine, Turner was not located until early the next morning hiding in a back room closet of the same residence on Big Doney Road. When apprehended, although Turner had his hands up, he did not obey law enforcement commands. As one of the deputies transported Turner to the cruiser, Turner kept saying he was "sorry," and something along the lines of, "was he your friend? Why are you so angry?"

{¶12} Turner was interviewed by Detective Sergeant Conkel. When Conkel questioned Turner, Turner said he was dope sick from using heroin.

When asked what happened, Turner said that the deputy walked in the house and said, "sheriff's department." Turner said he put his shoes on and Vance chased him. Turner then jumped in the water, and Vance followed, then Vance started beating him up. Turner denied pulling Vance under the water. When Conkel asked him if he harmed Vance, Turner responded, saying, "that's a lot of time; that's a lot of time." He said he was running and Vance was upon him. Turner said he went into the swamp and Vance started talking about tasing him. Turner admitted he told Vance, "you can't tase me because I'm in water." Turner claimed he got stuck in the mud, and Vance came after him. He claimed Vance started punching him in the face. Turner claimed all he was trying to do was to "get to land." He denied grabbing Vance's radio. Turner said when he crawled out of the pond, he went into the bushes and hid. He denied the allegations several times. Turner kept saying that Vance just kept punching him over and over.

{¶13} Turner said he "didn't know" how Vance got underwater; and claimed that Vance could not drown in that small amount of water. But then, when Conkel stated that one could drown in a teaspoon of water, Turner said, "I understand that." When asked what Vance was doing when Turner took off running, Turner claimed Vance just screamed to the law enforcement, "hey, I'm over here."

{¶14} At the same time he denied harming Vance, Turner claimed that the house was his grandmother's. He also claimed he received mail at that house. Turner continued to say he didn't harm Vance. He said, "[t]hat's too much time,

man . . . that's too much. . . ."  Conkel said during the interview that she saw a tiny red mark by Turner's eye, but briar marks all over him.  During Turner's interview, Conkel asked Turner whether Vance was attempting to get handcuffs on him, and Turner said, he didn't remember.  Conkel also said that Turner provided a number for his grandmother who supposedly rented the house, but when she called the number, it was not a working number and Turner also did not know the medical condition of his grandmother.

{¶15} On August 30, 2023 a Scioto County grand jury returned an indictment charging Turner with four counts:  Count 1, attempted aggravated murder, in violation of R.C. 2923.02, 2903.01(A), and 2929.02(A), a first-degree felony; Count 2, attempted murder, in violation of R.C. 2923.02, 2903.2(A), 2903.02(D), and 2929.02(B), a first-degree felony; Count 3, felonious assault, in violation of R.C. 2903.11(A)(1) and 2903.11(D)(1)(a), a first-degree felony; and Count 4, breaking and entering, in violation of R.C. 2911.13(A) and 2911.13(C), a fifth-degree felony.

{¶16} On September 6, 2023, the trial court held an arraignment at which time it appointed counsel for Turner, and Turner entered a not guilty plea.  The case proceeded to a four-day jury trial commencing February 20, 2024.

{¶17} At trial, the victim and several other law enforcement witnesses testified.  During cross-examination Deputy Vance admitted he was unsure whether he had lost consciousness in the water; however, when he came up from the water, he noticed Turner was on the other side of the pond.  So, he thought he did.  Also, Vance could not remember whether Turner succeeded in

putting him in a chokehold.  Vance also admitted during cross-examination he did not know whether Turner dunked his head into the water, or he ended up in the water as a result of his own actions.  However, he explained that the water at that point was not very deep, so his instinct would have been to catch himself if he had simply fallen, and if he had simply fallen he could not have eaten all the muck.

{¶18} The State also adduced testimony from medical personnel, including that of an emergency medicine professor from Shawnee State University who said that a near drowning, even in shallow water, carries a substantial risk of death.  He explained that if someone's nose and mouth is submerged they could drown, even in as little as two and one-half inches of water.  Further, that witness testified that placing someone in a chokehold cuts off the flow of blood and oxygen and also carries a substantial risk of death.  The evidence showed that some time afterward, Vance suffered an inner ear infection, a sinus infection, asthma, and long-term mental health issues.  He was off work for three weeks.

{¶19} The State presented Vance's medical records, bodycam footage from some of law enforcement (Vance had not been assigned a bodycam), and photographs showing Vance's pants and parts of his face covered in mud.  In those photo exhibits, it is apparent that Vance is soaking wet and has a substantial amount of mud and debris on his person and clothing.

{¶20} On February 23, 2024 the jury found Turner not guilty of Count 1 (attempted aggravated murder), but guilty of the other three counts of the indictment. The trial court sentenced Turner that same day to a prison term of 11-

16.5 years on Count 2; 11 years on Count 3; and 12 months on Count 4.  The

trial court ordered this sentence to run consecutively for a total prison term of 23-

28.5 years.

{¶21} Turner filed a timely notice of appeal and asserts two assignments of

error.

ASSIGNMENTS OF ERROR

I.  APPELLANT'S CONVICTIONS SHOULD BE REVERSED
    BECAUSE THERE IS INSUFFICIENT EVIDENCE TO SUPPORT
    THE FINDING OF GUILT BEYOND A REASONABLE DOUBT.

II. APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST
    WEIGHT OF THE EVIDENCE AND SHOULD BE REVERSED.

FIRST AND SECOND ASSIGNMENTS OF ERROR

{¶22} In his assignments of error, Turner asserts that insufficient evidence

supports the jury's verdicts in this case, and further, that his convictions are

against the manifest weight of evidence.  The State disagrees.  Turner does not

make any argument about the breaking and entering conviction but instead limits

his arguments to the convictions regarding attempted murder and felonious

assault.  We therefore limit our discussion accordingly.

A.  Law

{¶23} "In general, a claim of insufficient evidence invokes a due process

concern and raises the question of whether the evidence is legally sufficient to

support the verdict as a matter of law."  *State v. King,* 2022-Ohio-4616, ¶ 22 (4th

Dist.), citing *State v. Schroeder*, 2019-Ohio-4136, ¶ 59 (4th Dist.); *State v.

Thompkins*, 78 Ohio St.3d 380, 386 (1997).  Thus, "[w]hether the evidence is

legally sufficient to sustain a conviction is a question of law that this court reviews

de novo." *State v. Brown,* 2025-Ohio-2804, ¶ 16, citing *State v. Groce,* 2020-Ohio-6671, ¶ 7.  Viewing the evidence in the light most favorable to the prosecution the court asks whether " 'any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.' " *Id.*, quoting *State v. Dean*, 2015-Ohio-4347, ¶ 150, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.  Accordingly, "[t]he appropriate standard of review for a sufficiency-of-the-evidence challenge is 'whether, if believed, the evidence can sustain the verdict as a matter of law.' " *Id.* at ¶ 17, quoting *State v. Richardson*, 2016-Ohio-8448, ¶ 13.

{¶24} However, in a manifest-weight-of-the-evidence challenge, the court sits as the "thirteenth juror," and looks at the entire record to weigh the evidence and all reasonable inferences.  *State v. Brown,* 2025-Ohio-2804, ¶ 30.  In so doing, the court "considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered,' " *Id.*, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).  An appellate court "will vacate a jury's verdict and order a new trial 'only in the exceptional case in which the evidence weighs heavily against the conviction,' " *Brown* at ¶ 31, quoting *Thompkins* at 387, quoting *Martin* at 175.  Courts, therefore, "review the record to determine whether the 'jury clearly lost its way.' " *Id.,* quoting *Thompkins* at 387.

**{¶25}** Even so, we observe it is the role of the jury to determine the weight and credibility of evidence. *State v. Schluep,* 2025-Ohio-5866, ¶ 22 (4th Dist.) " ' "A jury, sitting as the trier of fact, is free to believe all, part or none of the testimony of any witness who appears before it." ' " *Id.,* quoting *State v. Reyes-Rosales*, 2016-Ohio-3338, ¶ 17 (4th Dist.), quoting *State v. West*, 2014-Ohio-1941, ¶ 23 (4th Dist.). The trier of fact should be accorded deference in evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility. *Schluep* at ¶ 22.

**{¶26}** We observe that " '[a]lthough sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency.' " *State v. Neff,* 2025-Ohio-1171, ¶ 46, (4th Dist.), quoting *State v. Gravely*, 2010-Ohio-3379, ¶ 46, 188 Ohio App.3d 825, 937 N.E.2d 136 (10th Dist.), citing *State v. Braxton,* 2005-Ohio-2198, ¶ 15 (10th Dist.), citing *State v. Roberts*, 1997 WL 600669 (9th Dist. Sept. 17, 1997). Hence, " 'a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency.' " *Id.*, quoting *Gravely* at ¶ 46; *State v. Wickersham*, 2015-Ohio-2756, ¶ 27, (4th Dist.) citing *State v. Pollitt*, 2010-Ohio-2556, ¶ 15 (4th Dist.). We therefore " 'first examine whether appellant's convictions are supported by the manifest weight of the evidence.' " *Id.* quoting *Gravely* at ¶ 46, citing *State v. Sowell,* 2008-Ohio-3285, ¶ 89 (10th Dist.).

**{¶27}** In proving its case, the State may rely on either direct or circumstantial evidence. "Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof." *State v. Jenks*, 61 Ohio St. 3d 259 (1991), paragraph one of the syllabus. *State v. Wickersham*, 2015-Ohio-2756, ¶ 39 (4th Dist.); *see also*, *State v. Barnes,* 2020-Ohio-3943, ¶ 23-24 (4th Dist.). In fact, "all courts have concluded that a defendant may be convicted solely on the basis of circumstantial evidence." *State v. Burns,* 2025-Ohio-5442, ¶ 26 (4th Dist.), citing *State v. Nicely*, 39 Ohio St.3d 147, 151 (1988); *State v. Anderson*, 2018-Ohio-2013, ¶ 40 (4th Dist.). Circumstantial evidence is defined as " '[t]estimony not based on actual personal knowledge or observation of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought to be proved.' " *State v. Meddock*, 2017-Ohio-4414, ¶ 54 (4th Dist.), quoting *State v. Nicely,* 39 Ohio St. 3d 147, 150, 529 N.E.2d 1236 (1988), quoting *Black's Law Dictionary* (5th Ed. 1979). Thus, a lack of direct evidence is not dispositive of a manifest-weight challenge. *Burns* at ¶ 26, citing *State v. Bradford*, 2017-Ohio-8481, ¶ 13 (8th Dist.); *Anderson* at ¶ 40.

## B. Analysis

**{¶28}** Turner claims on appeal that he was found guilty of attempted murder for trying to drown Vance in a small body of swampy water. He maintains that, while it is evident that Vance ended up in the water, how it happened was disputed at trial. Turner claims that the evidence shows he did not pull Vance into the water, and during his interview he denied he had drowned Vance or hurt

him in any way.  Turner acknowledges that he himself jumped into the swampy water, but claims it was to avoid getting tased.  Turner also points to medical testimony to claim that Vance did not experience a near-drowning, therefore, Turner claims he did not commit the offense of attempted murder.  Additionally, although not clearly differentiated from his attempted murder argument, Turner also challenges his felonious assault conviction.

{¶29} R.C. 2923.02(A), attempt, provides, "[n]o person, purposely * * *, and when purpose * * * is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense".  R.C. 2903.02(A), murder, states "[n]o person shall purposely cause the death of another * * *."  Additionally, R.C. 2901.22(A) states, "[a] person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."

{¶30} R.C. 2903.11(A)(1), felonious assault, provides, "[n]o person shall knowingly * * * [c]ause serious physical harm to another * * *[.]"  R.C. 2903.11(D)(1)(a) further provides, "[i]f the victim of a violation of division (A) of this section is a peace officer * * *, felonious assault is a felony of the first degree."  Additionally, R.C. 2901.22(B) provides:

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a

person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

**{¶31}** On appeal, Turner acknowledges the evidence showed that Vance went into the swampy water but argues that how Turner went into the water was disputed at trial. He claims that he did not pull Vance into the water. While this is true, he admits he ran from Vance and entered the water to avoid being tased, knowing the deputy could not tase him if he were in the water. This was supported by Turner's own words at the time, Vance's testimony, and Turner's statement to Conkel. Turner claimed he was stuck in the mud of the pond. In the pursuit of a suspect, and seemingly at Turner's request, Vance logically went into the pond as a result of Turner's actions.

**{¶32}** Once both men were in the water, Turner, who was significantly larger than Vance and only wearing underwear instead of 30 pounds of gear, resisted Vance's attempts to handcuff him. When Vance attempted to call for help, Turner took the radio and would not release it after repeated commands to let go. When Vance acted with force to get the radio back, Turner purposefully attempted to put him in a headlock, or a chokehold, which Vance was able to avoid. The next thing Vance knew, he was in the water, and Turner was on the other side of the pond, further attempting to run. While at various times, Vance testified that he was put in a "headlock" or "chokehold," he demonstrated to the jury how that action occurred, so the jury was able to determine the nature of the act. Further, testimony revealed that Vance had red marks consistent with his memory of the events, and Turner had only a small mark on his face, and marks

caused by briars.  Turner also continued to hide from law enforcement until early the next morning and appeared to be dishonest to law enforcement about other facts pertinent to the investigation.

{¶33} At trial, Vance stated he could not specifically remember losing consciousness; however, the date of the incident, he told medical personnel that he had lost consciousness.  Further, the evidence shows that his ears, nose, and hair were caked with mud, and that he was coughing up debris from the pond. Turner claims that one of the firefighter/paramedics, Green, testified that Vance's lung sounds were clear and his oxygen saturation was 100%.  However, Green also testified that he evaluated Turner some 20 minutes after the incident, after medical personnel had already administered oxygen.  In fact, Green testified that, even at that time, Vance was coughing up debris, including leaves, sticks, and black sewer mud, which smelled foul, like pond water.  Green also testified that even some time after the incident, Vance's blood pressure and pulse were elevated.  In addition, Green stated that Vance had redness across the chest, around the collarbone, and in the throat area.

{¶34} Turner also argues that Sergeant Nolen did not remember whether Vance was coughing as he walked back with Nolen after the incident.  However, the evidence shows that the first time Nolen saw Vance, Vance was down on all fours, crawling up over the edge of the hill.  Vance was crawling, pausing, stopping, hacking, coughing, and hyperventilating to the point Vance could not get out a word or two at a time.  Nolen also noticed that Vance had mud and green algae-looking material in his eyes, nose, and ears.  Vance's hair was

soaking wet, and it appeared that Vance's entire body had gone into the water. Nolen also saw Vance spit up a rather large chunk of "goop," brown and green mixed. In fact, Nolen was so concerned about Vance's health (and the squad was taking some time because of the rural location of the incident) that Nolen himself was going to take Vance to the hospital if the squad did not come soon.

**{¶35}** Turner argues that he did not hurt Vance in any way; however, there is ample evidence that his claims lack credibility. In his interview with Conkel, Turner claimed he was just trying to get to land. He did acknowledge that he knew someone could drown in that amount of water but claimed ignorance of how Vance ended up submerged in the water. Vance's version of the events is consistent with the other evidence presented at trial.

**{¶36}** Our review of the record shows that the State presented considerable evidence that Turner lured Vance into the pond, and, at first, simply resisted Vance's efforts to arrest him. However, Turner continued to resist and thwart Vance's efforts to radio for help, and when Vance struck Turner to gain control over the radio, Turner became irate, as evidenced by his words and behavior toward Vance. Then Turner purposely used his force and weight to place Vance into a chokehold, which caused Vance to lose consciousness, become submerged in the water, and ultimately almost drown. Vance's actions and statements to Conkel also demonstrate his intent. The evidence shows that Turner purposely engaged in conduct that, if successful, would have caused Vance's death.

**{¶37}** The evidence presented also shows that Turner committed felonious assault. In addition to presenting evidence that Turner put Vance into a headlock or chokehold, the State presented evidence that Vance suffered serious physical harm. The definition of "serious physical harm to persons, set forth in R.C. 2901.01(A)(5), includes "[a]ny physical harm that carries a substantial risk of death[.]" Paul Foit, an assistant professor of nursing and emergency medicine from Shawnee State, testified that near-drowning experiences like Vance's carries a substantial risk of death. Foit explained that even submersion in as little as two and one-half inches of water could result in a drowning death. Additionally, Foit explained that placing someone in a chokehold, which cuts off the flow of blood and oxygen, also carries a substantial risk of death. The evidence also showed that shortly afterward, Turner suffered an inner ear infection, a sinus infection, asthma, which required the use of an inhaler, and long-term mental health issues. He was off work for three weeks.

**{¶38}** The jury heard from Vance, who was extensively cross-examined, and numerous witnesses at the scene. They also listened to Turner's version of events through his taped statement to Sergeant Detective Conkel. They were provided several exhibits and attended a jury visit to the scene. The jury acquitted Turner of attempted aggravated murder, which shows they diligently deliberated and considered the evidence. *See State v. Thompson,* 2025-Ohio-3022, ¶ 30 (3d Dist.) (Jury did not lose its way when it weighed the evidence as to each specific charge rather than "blindly accepting the State's entire case.") Turner states that no bodycam recorded the incident nor did an independent

witness testify to corroborate Vance's testimony. However, the circumstantial evidence in the record supports Vance's version of the incident.

{¶39} The evidence presented demonstrates that the jury's verdict was not against the manifest weight of the evidence. Turner's actions, including fleeing and entering a swamp to avoid being tased, resisting arrest, and grabbing and pulling Vance's radio to prevent him from calling for help, illustrate a clear intent to evade capture. Furthermore, Turner's repeated actions of putting Vance into a headlock, leaving him unable to breath and submerged underwater, where he reemerged with symptoms of a near-drowning in murky pond water, underscores the serious physical harm inflicted. These actions collectively support the conclusion that Turner took substantial steps toward causing Vance's death. Further, the evidence shows that Turner knowingly caused serious physical harm to Vance.

## CONCLUSION

{¶40} Our review of the record shows the jury did not clearly lose its way resulting in a manifest miscarriage of justice. Accordingly, the manifest weight of the evidence supports the convictions in this case. Hence, we overrule Turner's assignments of error and affirm the trial court's judgment.

**JUDGMENT AFFIRMED.**

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. and Hess, J.:  Concur in Judgment and Opinion.

For the Court,


BY: _____
Kristy S. Wilkin, Judge


## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 22, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**